F I L E D

AUG 0 9 2023 BAR IFP

CLERK, U.S. DISTRICT COURT MP
NORTHERN DISTRICT OF CALIFORNIA

1  Mindy Pechenuk
   3730 Randolph Avenue
2  Oakland, CA  94602
   (323) 503-6198
3  Email:  mindypech@gmail.com
   In Pro Per
4

5              UNITED STATES DISTRICT COURT

6              NORTHERN DISTRICT OF CALIFORNIA         SK

7              SAN FRANCISCO/OAKLAND DIVISION

8                                              C23-04028

9  Jacqueline Carron-Cota;                  Case No: _____
   Hunter Cobb;
10 John Leon Guerrero;
   Gerald Pechenuk;
11 Mindy Pechenuk;                          **COMPLAINT FOR DAMAGES**
   Cindy Rocha;                             **AND DEMAND FOR JURY TRIAL**
12 Mark Zulim,
13        Plaintiffs,

14            v.                            1. 42 U.S.C. § 1983 – *Monell* & Supervisor
                                              Liability
15 COUNTY OF ALAMEDA; TIM DUPUIS;          2. Negligence
   CYNTHIA CORNEJO; JEFF NORMENT; LOLITA   3. 42 U.S.C. § 1985 – Conspiracy to Interfere with
16 FRANCISCO; RAYMOND LARA; GREGORY           Civil Rights
   AHERN; YESENIA SANCHEZ; NATE MILEY;
17 KEITH CARSON; DAVID HAUBERT; SUSAN
   MURANISHI; DONNA ZIEGLER; SHIRLEY N.
18 WEBER;
   and DOES 1 TO 50, inclusive,
19
20        Defendants
21

22        1. **Jurisdiction.** This court has jurisdiction over this complaint because it arises under the

23 Constitution and laws of the United States.

24        2. **Venue.** Venue is appropriate in this Court because a substantial part of the events, acts, and

25 omissions giving rise to this lawsuit occurred in this district.

26        3. **Intradistrict Assignment.** Because this lawsuit arose in Alameda County, it should be

27 assigned to the San Francisco/Oakland Division of this Court.
28

COMPLAINT
PAGE **1** OF **69**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PARTIES**

4. **Plaintiffs**

4.1  Lead Plaintiff **Mindy Pechenuk**, an adult over the age of eighteen, and at all times relevant hereto, was and is a resident of Alameda County, California.  Plaintiff M.Pechenuk was a candidate for state assembly during the June 2022 Primary and November 2022 Midterm Election cycles; and a volunteer election observer during the June 2022 Primary and November 2022 Midterm Election cycles.

4.2  Plaintiff **Jacqueline Carron-Cota**, an adult over the age of eighteen, and at all times relevant hereto, was and is a resident of Alameda County, California.  Plaintiff Cota was a volunteer election observer during the November 2022 Midterm Elections cycle.  Plaintiff Cota also chairs the not-for-profit Election Integrity Team of Alameda County, California (EITACCA, www.eitacca.org), of which all Plaintiffs herein listed are also members.

4.3  Plaintiff **Hunter Cobb**, an adult over the age of eighteen, and at all times relevant hereto, was and is a resident of Alameda County, California.  Plaintiff Cobb was a volunteer election observer during the November 2022 Midterm Elections cycle.

4.4  Plaintiff **John Leon Guerrero**, an adult over the age of eighteen, and at all times relevant hereto, was and is a resident of Alameda County, California.  Plaintiff Guerrero was a volunteer election observer during the November 2022 Midterm Elections cycle.

4.5  Plaintiff **Gerald Pechenuk**, an adult over the age of eighteen, and at all times relevant hereto, was and is a resident of Alameda County, California.  Plaintiff G.Pechenuk was a volunteer election observer during the November 2022 Midterm Elections cycle.

4.6  Plaintiff **Cindy Rocha**, an adult over the age of eighteen, and at all times relevant hereto, was and is a resident of Alameda County, California.  Plaintiff Rocha was a volunteer election observer during the November 2022 Midterm Elections cycle.

4.7 Plaintiff **Mark Zulim**, an adult over the age of eighteen, and at all times relevant hereto, was and is a resident of Alameda County, California.  Plaintiff Zulim a volunteer election observer during the November 2022 Midterm Elections cycle.

5. **Defendants**

5.1 Defendant COUNTY OF ALAMEDA is a political subdivision of the State of California, which operates, oversees, and manages the Office of the Registrar of Voters ("ROV") and the Alameda County Sheriff's Office ("ACSO").  The address of County Counsel for Defendant COUNTY OF ALAMEDA is 1221 Oak Street, Room 450, Oakland, CA  94612.

5.2 Defendant **Tim Dupuis** is and was at the time of the events or omissions which give rise to this lawsuit, the Registrar overseeing the office of the ROV as well as the Director of Information Technology for Defendant COUNTY OF ALAMEDA.  In doing the things herein alleged, Defendant DUPUIS was acting under color of state law and in the course and scope of his employment with Defendant COUNTY OF ALAMEDA, Defendant DUPUIS is sued in his individual capacity.  Defendant DUPUIS' address is 1225 Fallon Street, Room G-1, Oakland, CA  94612.

5.3 Defendant **Cynthia Cornejo** is, and was at the time of the events or omissions which give rise to this lawsuit, the Deputy Registrar in the office of the ROV.  In doing the things herein alleged, Defendant CORNEJO was acting under color of state law and in the course and scope of her employment with Defendant COUNTY OF ALAMEDA, Defendant CORNEJO is sued in her individual capacity.  Defendant CORNEJO's address is 1225 Fallon Street, Room G-1, Oakland, CA  94612.

5.4 Defendant **Jeff Norment** is, and was at the time of the events or omissions which give rise to this lawsuit, an employee in the office of the ROV.  In doing the things herein alleged, Defendant NORMENT was acting under color of state law and in the course and scope of his employment with Defendant COUNTY OF ALAMEDA, Defendant NORMENT is sued in his individual capacity.  Defendant NORMENT's address is 1225 Fallon Street, Room G-1, Oakland, CA  94612.

5.5 Defendant **Lolita Francisco** is, and was at the time of the events or omissions which give rise to this lawsuit, an employee in the office of the ROV.  In doing the things herein alleged, Defendant FRANCISCO was acting under color of state law and in the course and scope of her employment with Defendant COUNTY OF ALAMEDA, Defendant FRANCISCO is sued in her individual capacity. Defendant FRANCISCO's address is 1225 Fallon Street, Room G-1, Oakland, CA  94612.

5.6 Defendant **Raymond Lara** is, and at all relevant times was, the legal representative for the ROV. Defendant LARA's address is 1225 Fallon Street, Room G-1, Oakland, CA  94612.

5.7 Defendant **Gregory Ahern** was at the time of the events or omissions which give rise to this lawsuit, the Sheriff of Alameda County therefore responsible in charge of the Deputies involved in the events or omissions which give rise to this lawsuit.  Defendant AHERN's address is 3 Park Place, 3rd Floor, Dublin, CA  94568.

5.8 Defendant **Yesenia Sanchez** as the current Sheriff of Alameda County is the responsible in charge of overseeing all investigations by ACSO Internal Affairs into the events or omissions which give rise to this lawsuit.  Defendant SANCHEZ' address is 3 Park Place, 3rd Floor, Dublin, CA  94568.

5.9 Defendant **Nate Miley** is, and at all relevant times was, a member of the Alameda County Board of Supervisors; during the time of the events, through December 31, 2022 serving as Vice-President of the Board of Supervisors, and from January 2023 to the present serving as President of the Board of Supervisors.  Defendant MILEY's address is 1221 Oak Street, Room 536, Oakland, CA  94612.

5.10 Defendant **Keith Carson** is, and at all relevant times was, a member of the Alameda County Board of Supervisors; during the time of the events, through December 31, 2022 serving as President of the Board of Supervisors.  Defendant CARSON's address is 1221 Oak Street, Room 536, Oakland, CA  94612.

5.11 Defendant **David Haubert** is, and at all relevant times was, a member of the Alameda County Board of Supervisors; during the time of the events, through December 31, 2022, serving as

COMPLAINT
PAGE 4 OF 69

Supervisor, and from January 2023 to the present serving as Vice-President of the Board of Supervisors. Defendant HAUBERT's address is 1221 Oak Street, Room 536, Oakland, CA 94612.

5.12 Defendant **Susan Muranishi** is, and at all relevant times was, the County Administrator of Alameda County, overseeing, among other County agencies, the Office of the Registrar of Voters and the Office of Information Technology. Defendant MURANISHI's address is 1221 Oak Street, Room 555, Oakland, CA 94612.

5.13 Defendant **Donna Ziegler** is, and at all relevant times was, County Counsel for Defendant COUNTY OF ALAMEDA, which includes the Board of Supervisors and the County's agencies the ROV and the ACSO. Defendant ZIEGLER's address is 1221 Oak Street, Room 450, Oakland, CA 94612.

5.14 Defendant **Shirley N. Weber** is, and at all relevant times was, the Secretary of State of California. Defendant WEBER's address is 1500 11th Street, Sacramento, CA 95814.

5.15 The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as Does 1-50, inclusive, are unknown to Plaintiffs, who therefore sue said defendants by such fictitious names. Plaintiffs will amend this Complaint to show the true names and capacities if and when the same are ascertained. Plaintiffs are informed and believe, and thereon allege, that said Defendants, and each of them, are responsible in some manner for Plaintiffs' damages as herein alleged. Each reference in this Complaint to "defendant," "defendants," "Defendants," or a specifically named defendant also refers to all "Doe" defendants.

5.16 Plaintiffs are informed and believe and thereon allege that each of the Defendants sued herein was negligently, wrongfully, and otherwise responsible in some manner for the events and happenings as hereinunder described, and proximately caused damages to Plaintiffs. Furthermore, one or more Doe Defendants was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including the individually named and Doe Defendants.

5.17 Plaintiffs are informed and believe and thereon allege that at all times herein mentioned each of the Defendants, including all defendants sued under fictitious names, was the agent and/or

COMPLAINT
PAGE 5 OF 69

employee of each of the other Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of such agency and employment.

5.18  Plaintiffs are informed and believe, and thereon allege, that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship.  Plaintiffs are further informed and believe, and thereon allege, that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter otherwise specifically alleged.  At all material times, each Defendant was an integral participant, jointly engaged in constitutionally violative, unlawful, and/or tortious activity, resulting in the deprivation of Plaintiffs' constitutional rights and other actionable harm.

5.19  At all material times, each Defendant acted under colors of the laws, statutes, ordinances, and regulations of the State of California.

## INTRODUCTION

6.1  As specified in the Secretary of State's County Clerk/Registrar of Voters (CC/ROV) Memorandum No. 22233 dated September 19, 2022 (https://elections.cdn.sos.ca.gov/pdfs/observation-rights-responsibilities.pdf), election observers have the right to observe pre-Election Day, Election Day activities, and post-Election Day activities, as permitted by law, such as voting equipment preparation and testing, vote-by-mail processing; observe the proceedings at polling places, including the opening and closing procedures; take notes and watch election procedures being carried out by election workers; view election-related activities at the central counting site; view the canvass of the vote activities following the election; view all parts of the voting process, but in particular the vote-by-mail and provisional ballot processing; ask questions of election workers as long as they do not interfere with the conduct of any part of the voting process; ask questions of supervisors and managers at the central counting site and precincts

COMPLAINT
PAGE 6 OF 69

or Vote Centers as long as they do not interfere with the conduct of the election procedures; use an electronic device such as a smartphone, tablet, or other handheld device while at a polling place, vote center, or ROV provided that the use of the device does not result in a violation of any other provision of the California Elections Code.

6.2  California Elections Code §15004(a) states, "Each qualified political party may employ, and may have present at the central counting place or places, not more than two representatives to check and review the preparation and operation of the tabulating devices, their programming and testing, and have the representatives in attendance at any or all phases of the election." The Alameda County ROV, however, has asserted that this section of the California Elections Code "is not making suggestions or directing the ROV to take action." With this assertion, the ROV appears to have absolved itself of the duty to safeguard the civil rights of observers/challengers by permitting them access to the preparation and operation of the tabulating devices, their programming and testing, and attendance at any or all phases of the election.

6.3  Plaintiffs, who comprise a group of volunteer election observers from various organizations and of wide-ranging political affiliation – Republican, Democrat, Undeclared, etc. – having formed the Election Integrity Team of Alameda County, CA (EITACCA; www.eitacca.org), attempted to exercise their civil rights to observe and challenge where appropriate the November 2022 Midterm Election processes in Alameda County, California.  Moreover, one of the Plaintiffs was a bona fide candidate in said Election, with additional, U.S. Constitutional and State Constitutional specific rights to observe and challenge where appropriate said Election processes so as to better ensure the success of her political campaign.

6.4  Sadly, all Plaintiffs as observers/challengers in the November 2022 election cycle were denied their civil rights, due to the acts, behavior, and omissions of Defendant COUNTY OF ALAMEDA, its employees/agents within the ROV and Sheriff's Office both of which were functioning under color of authority as they conspired with one another in denying Plaintiffs of their rights; treating

Plaintiffs abusively and dismissively over a period of several months, harassing and intimating them, thereby disenfranchising Plaintiffs who by their voluntary efforts day after day were merely attempting to help instill and restore the community's confidence in the outcome of the current and future elections, all while undergoing duress from the Defendants' demonstrating a pattern of targeted, flagrant abuse.  One observer/challenger, Ms. Alison Hayden, was so purposefully and maliciously targeted, that the ROV collaborated with the ACSO to arrest her and hold her in detention in the county jail overnight, which caused a chilling and discouraging effect on all Plaintiffs.  Defendants exhibited by their actions, inactions, and capricious policies an obvious objective of intimidation to deter Plaintiffs and the public from participating in their civic duty and/or continuing their observations/challenges; and disregarded numerous and continuous attempts by Plaintiffs to compel Defendants to adhere to the most basic tenets of federal and state laws and regulations for the common good of the voting community.

6.5  This civil rights action seeks to vindicate Plaintiffs' constitutional and statutory rights and hold the employees/agents and their departments/agencies accountable for enacting unlawful practices and policies, as well as the omission of policies that resulted in the abrogation of their civil rights.

## GENERAL FACTUAL ALLEGATIONS

7.  The events of this case happened at the office of the Alameda County Registrar of Voters ("ROV"), 1225 Fallon Street, Room G-1, Oakland, CA  94612; and at the Alameda County Board of Supervisors' Meeting Chambers at 1221 Oak Street, Room 512, Oakland, CA  94612.

8.  The events happened throughout the overall period of the November 2022 Midterm Election, commencing with ROV activities related to early voting on October 10, 2022 (29 days prior to Election Day that constitute the "early voting" period); on through December 20, 2022, when the Alameda County Board of Supervisors, including Defendants MILEY, CARSON, and HAUBERT, ratified the ROV's December 8 statement of certification of the November 8, 2022 Election; and culminating approximately mid-February 2023 by which time the ROV had completed a review of the suspended ballots related to

the Oakland Unified School District 4 election results, which review Plaintiffs did observe and afterwards, upon extensive in-depth analysis, discovered significant anomalies and defects that Plaintiffs brought to the attention of Defendants DUPUIS, CORNEJO, NORMENT, FRANCISCO, LARA, MILEY, CARSON, HAUBERT, MURANISHI, and WEBER in her capacity as Secretary of State, in the form of emails and letters to Defendants, written complaints submitted to the office of the Secretary of State, in the form of Help America Vote Act ("HAVA") notarized filings, as well as public comments delivered in consecutive regular meetings of the Board of Supervisors.

9. The persons directly involved were Defendant DUPUIS, Registrar; Defendant CORNEJO, Deputy Registrar under the leadership and direct supervision of Defendant DUPUIS; Defendants NORMENT and FRANCISCO, who at the time of the events giving rise to this action were ROV employees under the direct supervision of Defendant CORNEJO; the following individuals in the ACSO: Lieutenant C. Mora and Sergeant Sass, who at the time of the events giving rise to this action were under the supervision of the Alameda County Sheriff, Defendant AHERN, later under the supervision of the Sheriff-Elect, Defendant SANCHEZ; and DOES 1 to 50 (various ACSO deputies) who at the time of the events giving rise to this action were under the supervision of Sheriff AHERN, later under the supervision of Sheriff-Elect SANCHEZ.

10. The persons indirectly involved were Defendants COUNTY OF ALAMEDA, MILEY, CARSON, HAUBERT, MURANISHI, ZIEGLER, LARA, and WEBER in her capacity as Secretary of State, as well as Defendants AHERN and SANCHEZ, the previous Alameda County Sheriff and the current Alameda County Sheriff, respectively, who are responsible for training and overseeing ACSO staff, and for investigating reports of any abuses, violations, or inappropriate behaviors by those staff members.

11. Observer/challenger Ms. Alison Hayden informed Plaintiffs that legal counsel for the ROV, Defendant LARA, has denied the fulfillment of, or entirely ignored, every public records request that she had submitted, including ACSO deputies' body cameras or ROV video surveillance records of all of Ms.

COMPLAINT
PAGE 9 OF 69

Hayden's observations, all electronic communications logs of Defendants and members of the public that may be related specifically to Ms. Hayden's arrest, and those records related to potential violations of the California Elections Code.

12. Following the October 5, 2022 arrest of CEO Eugene Yu of Konnech Inc., a vendor of Defendant COUNTY OF ALAMEDA under the direct oversight of Defendant DUPUIS, over the discovery of U.S. poll worker data being stored on servers in China, Ms. Hayden, who had been a poll worker in the 2022 primary election, submitted to Defendant LARA a public records request for the voting eligibility status of ROV poll workers during the 2022 election cycle. Defendant LARA refused her request for poll workers' eligibility, citing California Elections Code §12105.5, which Defendant LARA incorrectly claims protects the identity of ROV poll workers. California Elections Code §12105.5 states: *Not less than one week before the election, the elections official shall post a list of all current polling places in each precinct and a list of precinct board members appointed by the 15th day before the election. Not later than 28 days after the election, the elections official shall post an updated list of the precinct board members who actually served on election day. The election official shall post these lists in his or her office and on his or her official website, if any.*

13. Mr. Jason Bezis, attorney for the Alameda County Taxpayers Association ("ACTA"), as well as a volunteer election observer during the November 2022 Midterm Elections cycle and numerous prior elections in Alameda County, informed Plaintiffs that on October 11, 2022, he visited the ROV for the purposes of observing any pre-ballot processing activities. Mr. Bezis was told that VBM ballots are sorted by precinct number and stored in the blue plastic bins in the left back corner of the Ballot Opening room 16, according to their precinct number. Mr. Bezis was never allowed to see the actual ballots in the blue plastic bins, therefore was unable to confirm their existence let alone how/if they were sorted.

14. Mr. Bezis informed Plaintiffs that he had sent to the ROV a letter dated October 17, 2022, reminding them that as per the California Elections Code, the ROV was disallowed from beginning to process any ballots until October 25, 2022. Under California Elections Code §15104(d)(3) observers

have the right to observe and challenge the ROV's practices for "securing VBM ballots to prevent tampering with them before they are counted on election day," which was to begin no earlier than Tuesday, October 25, 2022, which effectively was the beginning of "Election Month."

15. On October 20, 2022, after conducting business in the courthouse across the street, Mr. Bezis decided to make his second surprise observation of the ROV's activities. [His first surprise visit was on October 11, which was within the Early Voting period (29 days prior to Election Day as prescribed in the California Elections Code).] ROV staff kept Mr. Bezis waiting for roughly twenty minutes, during which he witnessed a team of seven election workers, most wearing rubber gloves, pass the ROV office from the direction of room 16 (Ballot Opening) where the ballots ostensibly were being secured. They entered the ballot processing room opposite the men's restroom near the elevators. Mr. Bezis asked one of his ROV escorts what activity that team in rubber gloves was performing, and was told that they were making phone calls to other election workers. Mr. Bezis asked, "Making phone calls while wearing rubber gloves?" to which he received no further explanation. Mr. Bezis suspected that the workers were actually handling ballots returned from voters.

16. Mr. Bezis demanded to see the ballots that had already arrived. The ROV escorts led Mr. Bezis to room 16 (Ballot Opening), but did not allow Mr. Bezis to observe any closer than from the "bank teller" windows roughly forty feet away. It was not possible to verify that the blue bins ostensibly containing the VBM ballots were inside of envelopes, that those envelopes bore postmarks or other markings to show that the envelopes were received and were unopened.

17. Mr. Bezis proceeded to question the ROV staff: How many ballots total have arrived so far? Answer: "I don't know." Are all of the VBM ballots, including ballots collected from drop boxes, secured in this room? Answer: "They should be, but I don't really know." How many ballots are in those blue bins? Answer: "I don't know." Are there really ballots in those blue bins? Answer: "I don't know." How do you as an ROV employee know that there are ballots in those blue bins? Answer: "That's what we were told." What are those green plastic bins in the right rear of the room? Answer:

"They're for sorting of ballots."  Have the green plastic bins been used so far for this election?  Answer: "I don't know."  Were the green plastic bins used today?  Answer: "I don't know."  When did the ballots arrive today by U.S. mail?  Answer: "I don't know."  Of the twenty tables set up in this room (that looked like ballot extraction stations), have any of them been used yet for this election?  Answer: "I don't know."  Who has been sorting the VBM ballots by precinct to place in the blue bins and when does that activity take place?  Answer: "I don't know."

18.  Mr. Bezis advised the ROV escorts that he needed to speak to Defendant DUPUIS and/or Defendant CORNEJO, and asked that "someone" provide Mr. Bezis with "sufficiently close access" to verify what are the ballots actually in those blue bins.  As Mr. Bezis and the ROV escorts exited the secure area, Defendant DUPUIS happened to be entering it.  Mr. Bezis advised him that California Elections Code §15104 gave him the right to verify what VBM ballots actually were in the blue bins. Immediately, Defendant DUPUIS instructed the ROV escorts to contact the ACSO to have Mr. Bezis removed from the building.  Three ACSO deputies arrived.  Mr. Bezis cooperated with the ACSO deputies; however, he was still escorted from the ROV and the building.

19.  On October 21, 2022, Plaintiff M.Pechenuk and Mr. Ned Nuerge visited the ROV to check out the pre-processing setup.  They too observed that ballot processing activities were already under way, in violation of the California Elections Code.  The ROV employee at window 7 advised Plaintiff M.Pechenuk and Mr. Nuerge that they should come back the following Tuesday.  After Plaintiff M.Pechenuk explained the two problematic issues -- that ballot processing activities had already begun, and that observers were being disallowed the observation of those activities -- the ROV employee went to confer with supervisory staff, then returned to convey that supervisor's statement that Plaintiff M.Pechenuk and Mr. Nuerge would not be allowed to observe that day, and to come back on Tuesday, October 25th at 9am when "the official observing" was to begin.

20.  On October 24, 2022, Plaintiff Rocha and Ms. Anne Harris arrived at the ROV to observe the pre-processing preparations for the ballots that were scheduled to be opened commencing the next day,

COMPLAINT
PAGE 12 OF 69

October 25, 2022.  Plaintiff Rocha was interested specifically in where the VBM ballots were being

stored, but also in the configuration of the Ballot Opening room, the location(s) of any video surveillance

cameras, how close they were set up to allow remote viewers to actually see the ballots up close as they

were being handled by the election workers, the number of tables/stations, what the different colors of the

trays signified, how the various locations of shelving were intended to serve the ballot opening process,

etc.  Plaintiff Rocha and the other observer first checked in at the ROV reception window, where they

were told "Nothing is accessible for you today, come back tomorrow after 9am when we start opening

ballots."  Plaintiff Rocha presented a copy of the California Elections Code prescribing the right of

observers to see the location of VBM ballot storage and other ballot processing areas, however the ROV

receptionist again stated, "Come back tomorrow."

21.  Plaintiff Rocha went up to Room 104, which is the ACSO, for assistance, while the other

election observer remained downstairs in the ROV lobby.  Plaintiff Rocha spoke with Lt. C. Mora and

Sergeant Sass, both of whom stated they were unaware of any Early Voting procedures or rights of

election observers to verify anything or tour any ROV facilities.  Plaintiff Rocha explained the applicable

sections of the California Elections Code allowing for observations of all election processes for up to 29

days prior to Election Day, emphasizing that Plaintiff Rocha and the other observer merely were

intending to see the location of VBM ballot storage and Ballot Opening room set-up.  The two ACSO

staff agreed to reach out to the ROV in support of Plaintiff Rocha, after wrapping up a meeting they were

attending with higher-level ACSO staff.  Roughly thirty minutes later, the other observer joined Plaintiff

Rocha in ACSO room 104.

22.  While the other observer remained in room 104 awaiting an ACSO deputy escort, Plaintiff

Rocha went down to the ROV to speak with Defendant FRANCISCO, who as the head of poll worker

staffing had been the recipient of a letter from Plaintiff Rocha concerning the recently discovered

Konnech data breach of poll worker data.  Defendant FRANCISCO met Plaintiff Rocha in the ROV

lobby, and was joined by Mr. Noe Lucio, both of whom proceeded to escort Plaintiff Rocha to the Ballot

COMPLAINT
PAGE 13 OF **69**

Opening room, which they explained was the only room accessible at that time.  Defendant FRANCISCO also advised Plaintiff Rocha that regarding the Konnech matter, Defendant CORNEJO would be in contact with Plaintiff Rocha "soon" in response to Plaintiff Rocha's letter.  (Note:  No response was ever received.)

23.  Plaintiff Rocha asked Defendant FRANCISCO where any ballots received thus far at the ROV were being stored; she stated that the majority of ballots currently were being stored in the Ballot Opening room, where they were sorted by precinct, and that additional areas in which VBM ballots were being stored were not accessible to the public.  Upon returning to ACSO room 104 upstairs, Plaintiff Rocha was advised by the other observer that earlier when she had been downstairs in the ROV lobby she had observed ROV staff rolling large bins from an area to the left of the ROV lobby, down towards the other end of the corridor, evidently towards the VBM ballot storage/opening room 16 wherein Defendant FRANCISCO and Mr. Lucio would later enter with Plaintiff Rocha.

24.  On October 25, 2022, the ROV shared a link to their "remote observation" live video feed, which allowed viewing of Signature Verification room 17 only; i.e., no remote access to the VBM Ballot Opening room 16 or any other rooms at this time.  In room 17 viewers remotely could see election workers at workstations with computers showing scans of ballot signatures, but not providing the "sufficiently close access" that would enable observers to verify whether ballot signatures on the envelopes matched any of the four signature exemplars.

25.  In-personal observation at the ROV took place on the morning of Tuesday, October 25, 2022, by Plaintiffs M.Pechenuk, G.Pechenuk, and Cobb.  Defendant CORNEJO instructed them to refrain from taking pictures, but allowed them to take notes and ask questions.  Defendants CORNEJO, NORMENT, and FRANCISCO escorted Plaintiffs M.Pechenuk, G.Pechenuk, and Cobb, into Signature Verification room 17.  Observers were allowed to stand behind some, not all of the workers who were performing signature verification.  Plaintiffs M.Pechenuk and G.Pechenuk objected, as this limit was in violation of California Elections Code § 15104.  Furthermore, that signatures were determined to be good, when

clearly, they did not match any of the four signature exemplars.  Defendant CORNEJO stated that observers could not challenge signatures, "only the process," but could not explain what that means; the distinction between challenging signatures and challenging "the process."

26.  Plaintiff Cobb noted that in Signature Verification room 17, on the screen of one of the operators, there were two columns, with the signature on file on the left and the signature scanned from the ballot on the right.  If the operator wants to get a closer look, he or she has a space on the screen to get an enlarged view of the signature.  If there is still a question, the operator can go to the actual ballot envelope in the tray.  Plaintiff Cobb observed this happening a few times, but did not get an accurate count of the number of ballots in one of the black trays.  Plaintiff Cobb estimated that possibly fifty ballots were piled in one of the black trays.  Plaintiff Cobb observed one operator drawing two or three red lines over the tops of the set of ballots after they were done; then another worker came and collected the tray on a trolley, carrying it over to a storage shelf at the back of the room.  A tray of new ballots from a curtained storage shelf was then delivered to the operator to work on.  Plaintiff Cobb also observed one of the operators take a group of two or three ballots from their station over to the other side of the room after finishing a tray, and put them somewhere on the table.  Plaintiff Cobb asked Defendant CORNEJO if these were problematic/questionable ballots, to which Defendant CORNEJO responded "Yes." Defendant CORNEJO advised that they would be examined at the next stage of the process, but gave no qualitative information of what was to be verified or distinguished.  During Plaintiff Cobb's entire observation he was denied sufficient access as required by California Elections Code §15104 to ascertain exactly how the ballots were being marked and  why.

27.  Plaintiffs M.Pechenuk, G.Pechenuk, and Cobb were told that the black trays of ballots at each Signature Verification workstation are not, in fact, sorted by precinct.  Defendant CORNEJO explained that signatures are verified four at a time in four boxes on each computer screen; therefore, images of the VBM envelopes had already been scanned by this point.  Defendant CORNEJO advised that the scanning of the VBM envelopes was not observable by the public and was not willing to discuss

this policy further.  Plaintiff M.Pechenuk asked for the written procedures that ROV workers were following for every stage of the election, "cradle to grave," – that is, from collecting ballots from the drop boxes and Vote Centers, through specific ballot processing activities including storage, sorting, envelope scanning, ballot opening, signature verification, ballot review, ballot scanning, adjudication, tabulation, and other processes.  Defendant CORNEJO stated that the ROV did not issue such procedures to the public at this time.

28.  Additional in-person observation took place on the afternoon of October 25, 2022, by Plaintiff G.Pechenuk, Plaintiff Zulim, and Ms. Andrea Ingraham, that was limited to Ballot Opening/Extraction room 16, in which ballots are extracted from their signature-bearing envelopes.  Observers were confined to behind the plexiglass "bank teller" windows far removed from the actual election worker stations where ballot processing was taking place, therefore they were not granted "sufficiently close access" as required by California Elections Code §15104.  There were about twenty tables, all facing to the left, the closest more than twelve feet away from the observation windows and the furthest about fifty feet away.  Defendant CORNEJO was one of the three ROV escorts, and only then when asked about the colors of the various trays into which ballots were being sorted did she reply that blue meant they had passed the signature verification process and were ready to be opened, green meant the ballots had been reviewed by an election worker and deemed ready to be fed through the scanner at some unknown point in the future, and red meant damaged, stained, or otherwise unfit for scanning therefore needing to be adjudicated.  Plaintiff G.Pechenuk and Zulim noted that there was a significant number of ballots in the red trays, almost as many as in the green trays.  Plaintiffs G.Pechenuk and Zulim expressed their surprise at such a high "failure" rate, but were denied "sufficiently close access." as required by California Elections Code §15104 to the Adjudication room to get a closeup sampling of why some ballots were being rejected.  Defendant CORNEJO informed the observers that so far the ROV had received 59,000 VBM ballots, and stated that the ROV had plenty of staff on hand and could staff up further if needed.

COMPLAINT
PAGE 16 OF 69

29. Plaintiff Zulim noticed that at the exterior of the building, the loading ramp at the 13th Street intake area at one time had had a surveillance camera that now was missing.  It looked to have been removed.  Plaintiff Zulim was unable to attain a clear answer to his inquiry regarding whether ACSO staff was monitoring the intake area in any way, given the removal of CCTV capability.

30. On October 26, 2022, Plaintiff M.Pechenuk performed observation in Signature Verification room 16, in which ROV staff had corrected their procedure such that observers were able to see all of the terminals.  However, Plaintiff M.Pechenuk observed signatures that should have been rejected continue to pass through the process.  Plaintiff M.Pechenuk then was taken to Ballot Opening room 16, where observers were confined to a small area behind "bank teller" windows, too far away from the ballot processing workstations to allow for any possibility of actually verifying any of the ballots as they were being opened.  For example, "sufficiently close access" as required by California Elections Code §15104 was not provided in order to determine whether the ballots had been completed by human hands or had been machine generated.  Nor could Plaintiff M.Pechenuk "verify" or distinguish the accuracy of sorting, nor as to why the ballots were being rejected and sent to the "red tray" for adjudication.  Plaintiff M.Pechenuk questioned the ROV escorts, but was told to direct any questions in writing to Defendant CORNEJO.

31. On October 27, 2022, Plaintiff Cobb was escorted by Mr. Noe Lucio and two other ROV staff members.  Mr. Lucio stated that the only "processes" available for viewing by the public are signature verification, ballot opening, and ballot scanning.  When Plaintiff Cobb expressed incredulity at these limitations, and his interest in seeing from where the ballots were brought, such as from the drop boxes, Mr. Lucio stated that Plaintiff Cobb would have to send an email to Defendant DUPUIS, who would "check with the Alameda County Board of Supervisors."  (Note:  This request was not followed through, and Plaintiff Cobb did not receive an answer.)  Plaintiff Cobb was then escorted to room 16 (Ballot Extraction/Opening), where Mr. Lucio explained that the ballots had already been hand-sorted by precinct.  Workers were collecting the "good" stacks and taking them to a shelving area in the back to the

COMPLAINT
PAGE 17 OF 69

left, which was impossible to observe from the "bank teller" windows.  Given that Plaintiff Cobb was denied "sufficiently close access," as required by California Elections Code §15104, the integrity of the ballots was not observable either.

32. Plaintiff Cobb was told that the VBM and drop-box ballots are not stored or processed separately; that the total number of ballots received is updated nightly on the ROV website; and that the scanning of the ballots would be starting soon, but the vote tabulation would not be done until after 8pm on Election Day, November 8, 2022.

33. Plaintiff Cobb inquired about the second level of signature verification; the procedure of looking at the envelopes that had been questioned at the first level.  Defendant DUPUIS happened to enter the ROV lobby at this time, and explained that staff in charge of the Signature Verification room 17 handle it day-by-day, in that the ROV is not accumulating "a pile" of questionable ballots but rather is dealing with them and resolving them daily.  Defendant DUPUIS was unable to provide details as to who was involved in making the final determinations, or whether election observers would be allowed to witness any of the decision-making process.

34. Plaintiff Cobb asked Defendant DUPUIS about the asset tracking system for monitoring the pick-ups and deliveries from the drop-boxes; i.e., the "chain of custody" system.  Defendant DUPUIS could not or would not provide a satisfactory response, instead explaining that there are many different ways the ballots come in – the drop boxes, the U.S. mail, through the vote centers, those dropped off at the ROV – so it is not one system."  Plaintiff Cobb could not surmise whether Defendant DUPUIS was being evasive, or was simply ignorant of the "chain of custody" concept, given that the ROV works off of computer programs that have all the drop boxes mapped out, the pick-ups scheduled, and certain staff allocated to those portions of ballot collection.

35. On October 27, 2022, Plaintiffs participated as observers at the Logic & Accuracy (L&A) Testing of the machines' accuracy, with Defendant CORNEJO presiding over the observers.  During the testing session, only one (1) tabulator was tested, even though there are sixteen additional machines in use

by the ROV in the course of the election.  In addition, only six (6) ballots were put through the tabulator, none of which tested for stray marks, "undervotes," "overvotes," damaged ballot, etc.  When Dr. Joseph Grcar, one of the election observers in attendance, pointed out to the members of the grand jury that they should question the ROV staff about these and other deficiencies in the so-called "Logic and Accuracy" testing, that observer was escorted out of the room by ACSO deputies.

36.  L&A Testing failed to include the testing of the Ranked Choice Voting (RCV) algorithm(s), which are suspected to be the source of the failures found in the 235 "suspended ballots" of the OUSD4 election; likely outcome failure of the 810 suspended ballots of the Oakland Mayoral race; and likely outcome failures of suspended ballots of both of San Leandro's RCV races.  EITACCA analyzed and found three (3) of the 235 suspended OUSD4 ballots wherein the scanned ballot differed from the ROV's digital record of those votes [Cast Vote Record (CVR)], that had been recorded as given to other candidates.  In other words, the paper ballots did not match the CVRs.  Given that Defendants MILEY, CARSON, and HAUBERT as members of the Alameda County Board of Supervisors, as well as Defendants MURANISHI, LARA, and ZIEGLER, who were made well aware of the numerous election defects and their legal ramifications, refused to investigate the similar problems that occurred in the Oakland mayoral race and two San Leandro races that utilized RCV software, and may likely expose algorithmic manipulations set by human operators.  Their refusal to investigate further is itself cause for investigation in the interest of justice.

37.  On October 27, 2022, Mr. Bezis informed the Plaintiffs that while observing in person at the ROV, he noticed that workers were putting opened, flattened ballots in the tall blue bins in the leftmost, rear area of room 16, which is contrary to what he had been told, in his previous visits to the ROV on October 11 and October 20, that the blue bins were where the unopened VBM ballots were being stored until October 25, which was the start date for ballot processing.  Given that Mr. Bezis was deprived of "sufficiently close access" to the blue bins to confirm they contained the alleged VBM ballots, it appears that the blue bins may, in fact, have been empty.

COMPLAINT
PAGE 19 OF 69

38. It also raised the question of where the newly-arrived ballots from U.S. mail and drop boxes were being stored. The ROV escorts in room 16 told Mr. Bezis that they were not being stored in room 16, however the ROV staff in the front office advised that the newly-arrived U.S. mail and drop box ballots were, in fact, stored in room 16, in the mail sorting area in the rear middle of the room, with the black bins.

39. On October 28, 2022, Mr. Bezis informed Plaintiffs that while viewing the live feed from the video surveillance in the Ballot Opening room 16, he noticed that for most of the day, ROV staff walled off the ballot sorting area containing the black bins by placing rows of carts in front of it.

40. By October 28, 2022, a very basic question arose regarding the "chain of custody" of VBM ballots in Alameda County. They arrive at the truck/van loading dock, are then "secured" in some unknown location, possibly in the black bins in the rear of room 16, before they are "scanned" for signatures in yet another "secret" location. The first time that VBM ballots emerge into public view is with Signature Verification in room 17.

41. Observers/challengers are entitled under California Elections Code §15104 to see ALL steps of VBM ballot processing to ensure that Defendant DUPUIS, Defendant CORNEJO, and all ROV employees are "securing VBM ballots to prevent tampering with them before they are counted on election day."

42. On October 28, 2022, Plaintiff Cota met with the Chief of Staff of Defendant COUNTY OF ALAMEDA Supervisor Defendant HAUBERT, and Defendant DUPUIS. During this meeting, Plaintiff Cota asked about the delay in receiving the ROV's written procedures for all election processes including ballot collection, storage, and further processing. Defendant DUPUIS claimed that they were overwhelmed by the amount of "public records requests" they had received; that although he was aware there is a certain time limit for replying to those requests, it had reached the point where Defendant DUPUIS may have to ask for more staff in order to accommodate the number of requests coming in. Defendant DUPUIS assured Plaintiff Cota that procedures would be forthcoming "soon." Plaintiff Cota

COMPLAINT
PAGE 20 OF 69

asked why procedures were not readily available, since ROV staff seemed to hand them out to certain observers once they walked in.  In addition, why the ROV was unable to provide the procedures to the members of EITACCA without a "public records request."  Defendant DUPUIS did not have a response.

43. Plaintiff Cota pointed out that the California Elections Code was not being followed by the ROV in terms of observations being allowed, with "sufficiently close access," 29 days before Election Day and thereafter until the election is certified.  Defendant DUPUIS claimed that the ROV had never had observers that early, that it was very odd, and that they had more "early" observers than they have ever had.  Defendant DUPUIS further stated that he and his lawyers interpret the Code differently, that Plaintiff Cota and he would have to agree to disagree, and that there is an election judge "on call" just waiting for people to challenge any of the ROV's procedures, therefore the observers were "welcome to file a lawsuit."

44. Plaintiff Cota asked Defendant DUPUIS why the observers were not allowed to observe the VBM delivery, storage, signature review, and other activities of ROV staff.  Defendant DUPUIS claimed that these are not "processes," but would not elaborate as to what this meant exactly.

45. At the close of the October 28, 2022 meeting between Plaintiff Cota and Defendant DUPUIS, with participation by Vice-President Supervisor HAUBERT's Chief of Staff, Defendant DUPUIS mentioned what had occurred during the L&A Testing on October 27, 2022, wherein an observer was escorted out by ACSO deputies due to a disruptive comment targeting a member of the grand jury. Plaintiff Cota, who had been observing the L&A Testing remotely via the video feed, corrected Defendant DUPUIS, in that the observer had been directing his comment not to a grand jurist but to the ROV staff who had been conducting the testing.  Plaintiff Cota felt obligated to respond upon hearing the misleading response that Defendant DUPUIS had given to the grand jurist regarding stray marks on ballots not being a part of the L&A Testing prescribed by the California Elections Code.  Nevertheless, during the meeting with Plaintiff Cota, Defendant DUPUIS continued to insist that based on the

COMPLAINT
PAGE 21 OF 69

disruptive comment by one of the observers in attendance at the L&A Testing, he was now quite concerned about the physical safety of his entire ROV staff as they continued in the election cycle.

46. On October 31, 2022, Plaintiff Rocha performed election observation from 11am to 2pm. Plaintiff Rocha was escorted to Signature Verification room 17 by Defendants CORNEJO and FRANCISCO. Defendant CORNEJO explained that although typically a person's signature tends to vary over time, there are key features of that signature by which it may be determined to be valid/true; that if the worker is going to question a signature, he/she will have to show the supervisor at least one key feature that is questionable. All questionable signatures then go to the next level of review, which is the supervisor, then if the supervisor agrees that a signature is suspect then the ballot goes up to Defendant CORNEJO for review, and then finally, Defendant CORNEJO claimed, the ballot is reviewed by Defendant DUPUIS. Defendant CORNEJO did not have any data regarding how many of the questionable signatures had finally been accepted or rejected. When Plaintiff Rocha expressed incredulity over such an intensive process, which would require a significant time investment each day, by Defendants CORNEJO and DUPUIS, Defendant CORNEJO advised that not that many ballots are deemed questionable to undergo the higher-level review.

47. Plaintiff Rocha inquired whether the ROV had established written procedures. Defendant CORNEJO stated that staff undergoes training, that they do have "some" procedures but they are not published, or available to the public, as the Election Administration Plan is. Plaintiff Rocha asked if a specific procedure is requested, such as a "flow diagram" to show the path of a suspect signature, from the time that the election worker reviews it, to when Defendant DUPUIS finally accepts/rejects it. Defendant CORNEJO stated that the ROV could provide such procedures. Plaintiff Rocha asked whether the ROV has an Election Procedures binder containing all of the procedures utilized by ROV staff and full-time, part-time, and permanent or temporary position employees for their reference as they performed their work, as other counties have. Defendant CORNEJO smiled, seeming to find this question amusing, stating, "Maybe other counties have one, but not Alameda."

COMPLAINT
PAGE 22 OF 69

48. Plaintiff Rocha then was escorted to the Ballot Opening room 16, and noticed that the tables had been re-oriented to now be perpendicular to the "bank teller" window wall. Ostensibly this was to accommodate the cameras on either side of the room, for purposes of remote/online viewing. There were fourteen (14) workers at these long tables, plus one supervisor roving and apparently answering their questions. Along the back wall of the room, roughly twelve (12) workers sorting ballots from black trays/bins into other black bins with blue labels. Defendant CORNEJO advised that this was the first level of sorting. Defendant CORNEJO then left the room. Plaintiff Rocha was not allowed "sufficiently close access" as required by California Elections Code §15104 to any activities in this room.

49. Workers at the tables were looking at opened ballots page-by-page, front and back, confirming that all pages are from the same precinct, and that no ballots were damaged. Ballots that were done being reviewed were put in a pile, then the pile was picked up and taken to the bank of shelves with a sign that stated, "ready for scanning," meaning these ballots were to be scanned so they could be stored electronically. Of course, by this time the ballots have been separated from their envelopes. Plaintiff Rocha asked where the envelopes end up. Defendant FRANCISCO stated, "They get stored," however she did not know where. Each worker had a red bin into which the damaged ballots were placed, according to Defendant FRANCISCO. Of the fourteen workers, it was not visible to Plaintiff Rocha whether any of them had "damaged" ballots in their red bins.

50. On Tuesday November 1, 2022, Plaintiffs M.Pechenuk, G.Pechenuk, Cobb, and other members of the public concerned about the integrity of the County's elections testified at the Regular Meeting of the Board of Supervisors, alerting Defendants MILEY, CARSON, HAUBERT, and MURANISHI of the ROV's serious and egregious departures from the California Elections Code and U.S. Constitutional law with respect to the civil rights of observers/challengers at the ROV. Plaintiffs described their treatment at the ROV thus far, the ROV's veiled threats to engage law enforcement due to alleged disruptive behavior by Plaintiffs, the disinterested attitude of ACSO deputies when Plaintiffs sought their assistance and support in gaining access to the ROV, in a sincere effort to caution Defendants

COMPLAINT
PAGE 23 OF 69

that things seemed to be coming to a head and could possibly result in a serious miscarriage of justice to Plaintiffs. Plaintiffs put Defendants MILEY, CARSON, HAUBERT, and MURANISHI on notice that significant violations were taking place, and requested that Defendants take appropriate action with the ROV so as to address those violations and prevent ROV staff from continuing to violate the civil rights of observers/challengers attempting to exercise and perform their civic duties at the ROV.

51. On November 5, 2022, Plaintiff Cobb paid another visit to the ROV and asked to see Defendant DUPUIS so that Defendant DUPUIS could finish his explanation, which had been requested by Plaintiff Cobb on October 27, 2022, of the mail-in ballot process. During that earlier discussion, Defendant DUPUIS did not appear to be familiar with the mail-in ballot process. Plaintiff Cobb was advised that Defendant DUPUIS was in a meeting. Plaintiff Cobb proceeded to Signature Verification room 17, where he noted that it had been reconfigured such that observers were now allowed to walk up and down the aisles and between the workstations for closer observation.

52. Plaintiff Cobb then was escorted to the Ballot Opening room 16, where only one worker was sitting at a table, handling ballots and putting them into a bin, but not taking them out of their envelopes. This was roughly 10am, and the ROV escort advised that they were not yet set up for ballot opening that day. Plaintiff Cobb was confined, as per the ROV policy, to the area of the "bank teller" windows far removed from the location of ballots being handled or sorted. Plaintiff Cobb was not permitted to enter any other rooms in which ballots were being stored, scanned/digitized, sorted, adjudicated, or any other processing.

53. On November 5, 2022, upon learning that ballots were now being processed in the Adjudication room, in the Automatic Signature Recognition (ASR) room, and in the Ballot Scanning room, the Alameda County Taxpayers Association (ACTA) submitted a request to the ROV for procedures that the ROV intended to utilize in those rooms, as well as other procedures that had previously been requested, such as for the handling of VBM ballots between arrival in the County building complex and further processing in the ASR room. Note that the ROV had failed to respond to

COMPLAINT
PAGE 24 OF 69

ACTA's previous requests dated October 17, 2022 and October 26, 2022, even though these letters had been discussed in closed session during the November 1, 2022 Board of Supervisors meeting.

54. On November 5, 2022, ACTA submitted a second letter to ROV, advising of ROV staff accompanying election observers on tours not having answers to most questions and consistently, typically stating that questions are to be submitted in writing. In this letter, ACTA specifically asked about the function of the rows of tall blue bins in the left rear corner of Ballot Opening room 16, which is thirty to forty feet distant from the "bank teller" windows in front of the election observers. ACTA also asked about the following activities that were staged too far away for election observers to observe, and about which the ROV escort staff could not explain:

- function of the short white trays in the back middle of room 16

- function of the short black trays in the back middle of the room

- function of the short green trays in the back middle of the room

- what activity was occurring in the right back area of the room, hidden behind the "milling room."

55. ACTA reiterated the demand for "sufficiently close access" to verify the secure storage location of newly-arrived VBM ballots from U.S. mail, drop boxes, Vote Centers, etc.

56. ACTA noted that the "virtual" observation cameras are shut off before ballot processing is concluded each day; on or about 4:30pm, despite the fact that election workers are moving ballots about room 16. ACTA noted that camera feeds should not be cut off or otherwise concluded until all ballot processing activities, especially the emptying of the red trays holding irregular ballots at the Ballot Opening stations, are completed for the day.

57. On November 7, 2022, ACTA submitted a letter to the Office of the Alameda County Counsel, regarding violations by the ROV with respect to California Elections Code §2300, §15104, and §15204; and concerning non-compliance with established VBM ballot adjudication and remake procedures and in ballot scanning.

COMPLAINT
PAGE 25 OF 69

58. On November 7, 2022, Plaintiff M.Pechenuk and Mr. Ned Nuerge were permitted under ROV escorts, including Defendant CORNEJO, only into the Ballot Opening room 16 and the Signature Verification room 17. No observers were allowed into the Adjudication room or ASR room. In the Ballot Opening room, there was still no "sufficiently close access" to verify the accuracy of the tasks being performed. Plaintiff M.Pechenuk asked Defendant CORNEJO where the VBM ballots were being stored; Defendant CORNEJO stated that they were stored in what the ROV called "the library," in the blue bins on the left side towards the back of the room, some thirty-to-forty feet from the observer windows. Observers were never allowed proximity to verify or distinguish that the ballot envelopes had actual mailed stamps on them and/or from which carrier, nor why they were sorted into different bins, and categorized for the various ballot processes. Plaintiff M.Pechenuk could not see what was actually in the bins, but observed that the opened ballots that had been extracted from their envelopes were being placed in those bins.

59. Plaintiff M.Pechenuk observed, from the outside station where the public can drop off their ballots, two election workers walk a yellow bin to the ground floor of the ROV, having gone through the same security entrance as the observer had gone through. Plaintiff M.Pechenuk accompanied them in the elevator, then they proceeded down the hall past the corridor to Signature Verification room 17, then past the Adjudication room, and finally made a right down another corridor.

60. Plaintiff M.Pechenuk asked Defendant CORNEJO about the Adjudication activities. Defendant CORNEJO stated that they only do adjudication when they are scanning. Plaintiff M.Pechenuk checked for the virtual feed in the Adjudication room, which became available at 3:15pm.

61. On November 8, 2022 early in the afternoon, the virtual feed into the Automatic Signature Recognition (ASR) room became active. Thus far, no election observers were allowed to observe in person. The question remained unanswered – that is, no observers had received answers, verbally or in writing, from ROV staff to the verbal/written questions they had submitted -- about the sorting process in

COMPLAINT
PAGE 26 OF 69

which VBM ballots are placed into the blue trays that are kept in the Ballot Opening room 16; as these blue trays are what are fed into the four ASR scanning machines in the ASR room.

62.  On November 8, 2022 election observers began gathering at the ROV from about 4pm onward.  Election observers expected to see a parade of vehicles lining up around the building, with ballots from some of the drop boxes stationed throughout the county, especially drop boxes that were filled to capacity in the days leading up to Election Day, as well as on Election Day itself.  There were few, if any, such vehicles present.

63.  Present as observers on November 8, 2022 were Plaintiffs M.Pechenuk, Cota, Cobb, Guerrero, G.Pechenuk, Rocha, and Zulim; as well as Dr. Joseph Grcar, Rev. Dennis Thomas, Ms. Rachel Banke, Ms. Stephanie Szto, Ms. Alison Hayden, and several others.  Defendant CORNEJO was again asked where the vote center ballots that had been cast as early as October 29 were being stored, to which she replied, as before, that they were all being stored in the Ballot Opening room 16, along with all the VBM ballots.  Remote observers noted that video feeds had been off all day in three rooms:  Ballot Opening room 16, Adjudication/Remake room, and Ballot Scanning room.  ROV staff were not allowing any observers/challengers into these rooms.

64.  The ASR room and Signature Verification room were active most of the day on November 8, 2022.  From approximately 4:30pm to 8:30pm observers were allowed into the Signature Verification room, three observers at a time, for roughly fifteen minutes of observation allotted to each group, but no observers were allowed into the ASR room.

65.  In the Signature Verification room, Plaintiff Rocha and Ms. Hayden were in the same observation group.  Plaintiff Rocha witnessed Ms. Hayden, while observing an operator at the front of the room reviewing a signature against the four signature exemplars on the computer screen, calmly ask the operator a question:  Why were the operators clicking as "accepted" numerous signatures on the envelopes which bore no relationship to the exemplars online?  Plaintiff Rocha could not distinguish the question (but was later apprised by Ms. Hayden), as Ms. Hayden had addressed the operator in a low tone

COMPLAINT
PAGE 27 OF 69

of voice so as not to disturb the proceedings.  One of the ROV escorts close by, at the front of the room, immediately directed Ms. Hayden forward to where the escort was standing, and proceeded to berate her about interacting with the election worker.  After Ms. Hayden asked the escort a question, which he was unable or unwilling to answer, the escort directed Ms. Hayden to leave the Signature Verification room.

66.  Once all of the gathered observers had been given the opportunity to observe in the Signature Verification room, Defendant CORNEJO stated that there was nothing more to see for now.  Observers were then corralled into, and made to wait, in a cordoned off area roughly six feet by twenty-five feet in the lobby of the ROV until about 8pm when they would be allowed to cycle into the Ballot Scanning room.  Defendant CORNEJO stated that, since "nothing was going on" until after all the polls closed at 8pm, the observers/challengers would have to remain within the cordoned off area until then.  Contrary to Defendant CORNEJO's statement, ROV workers were observed rolling carts back and forth between several rooms of the ROV basement, which appeared to indicate that activities were, in fact, "going on." [Meanwhile, having been ejected from observing ballot processing inside the building, Ms. Hayden remained outside along with Plaintiff Zulim, observing ballots being dropped off and carted to various entrances of the building until roughly 10pm that night.]

67.  Evidence that the ROV was processing ballots while the observers were corralled in the ROV lobby became increasingly obvious because two observers left the cordoned area and went down the corridor to an open door at the west end of the ROV where ballots were being handled by workers, which observers were able to view through the open door.  The west end room had a door connecting directly to the 12th Street delivery portal where ballots were being received and brought into the building, arriving in black canvas bags and boxes whose exact markings could not be ascertained by observers because they had been denied "sufficiently close access." as required by California Elections Code §15104.  Outside the building, Plaintiff Zulim and Ms. Hayden were prohibited from entering the "tent" where ballot delivery drivers would check in their seals and clear their "chain of custody" documentation with supervisory ROV staff, thereby no verification could be made of what, if any, chain of custody

COMPLAINT
PAGE 28 OF 69

procedures or controls had been established or were in operation.  Observers were only permitted to

merely watch from a ten-to-thirty-foot distance many carts and boxes being brought into the ROV from

the passenger elevators and also from around the corner from other ends of the main corridor within the

ROV basement.  Lastly, during the same time period other observers viewing activities via the video feed

reported that the ROV was performing ballot processing activities in the Ballot Scanning room, Signature

Verification room, Ballot Opening room, and at sorting stations, in what was apparently not a real-time

video of the processes.

68.  During the roughly two hours of waiting time until observers would be allowed to begin

observations in the Ballot Scanning room, some observers removed their masks while they ate snacks or

drank water, and talked among themselves.  Defendant CORNEJO advised that masks had to be worn at

all times, as per County policy.  One of the observers challenged the policy, pointing out that the mask

ordinance had been lifted at the state level.  Defendant CORNEJO then summoned the ACSO staff, which

arrived immediately, consisting of Lieutenant C. Mora, Sergeant Sass, and three additional deputies to

warn the election observers, who were assembled in a cordoned off area in the ROV lobby, not to behave

in a disruptive fashion.  By the time that ACSO appeared, most of the twelve observers, including Ms.

Hayden, were sitting on the floor, conversing among themselves in small groups.  Lt. Mora and Sgt. Sass

directed their remarks primarily to Ms. Hayden.  Ms. Hayden and other observers attempted to explain

their rights under the California Elections Code to observe all election activities, however the ACSO staff

advised that they were only there to maintain order, not to challenge any of the policies of the ROV, any

of its staff members, or discuss any California Elections Code sections.

69.  Several minutes after ACSO staff left the ROV lobby, Ms. Hayden left the ROV lobby for

roughly fifteen minutes, then re-joined the other observers sitting in the cordoned off area opposite the

ROV windows.  As Ms. Hayden was approaching the larger group of observers/challengers, Plaintiffs

witnessed an apparent altercation begin between Ms. Hayden and ACSO deputies near the corner of the

ROV lobby where it connects to the elevator area.  Defendant CORNEJO marched over to Ms. Hayden,

COMPLAINT
PAGE **29 OF 69**

accompanied by Sgt. Sass and two other deputies, stating that Ms. Hayden was disrupting the process therefore must leave immediately. Ms. Hayden asked what she had done. Defendant CORNEJO did not reply, however Sgt. Sass stated that everyone had to step away and talk about it. Ms. Hayden complied, turning towards the exit, flanked by the deputies as they all walked upstairs. Once upstairs, Sgt. Sass stated that Ms. Hayden was being ejected from the building and denied her right to further observe the ballots and election processes. Plaintiff Zulim chose to accompany Plaintiff Hayden from the ROV basement all the way out to the building exterior, concerned that ROV and ACSO staff might ill-treat her at some point along the way.

70.   Meanwhile, observers including the other Plaintiffs, most of whom were sitting in the "corral" that the ROV had set up in a small area of the public corridor, had noticed the commotion down the corridor where Ms. Hayden was surrounded by Defendant CORNEJO, other ROV staff, and the ACSO deputies. Plaintiffs had watched in stunned silence and alarm as Ms. Hayden was being accosted. At that fateful moment, the message from Defendants DUPUIS and CORNEJO came across to Plaintiffs and all the other observers, in no uncertain terms, loudly and clearly: "Do not challenge us, or this will happen to you too." The chilling and intimidating effect of the ROV's behavior, in collaboration with the ACSO, on Plaintiffs' civil rights to observe and challenge election activities was unmistakable.

71.   Another election observer, Rev. Dennis ("Rick") Thomas, who along with Plaintiff Zulim, had accompanied Ms. Hayden upstairs as she was being removed by ACSO deputies from the building, went back downstairs to retrieve Ms. Hayden's belongings, then joined Ms. Hayden outside where they observed the delivery of ballots from the drop boxes. While at this location, Plaintiff Zulim and other observers were not permitted near the tent where drivers' documents were being cleared, were not only deprived of "sufficiently close access," but any access at all to view the checking in of "chain of custody" documentation. Plaintiffs were only able to see the duffle bags of ballot envelopes being dragged from cars to tents that were off-limits to observers. Plaintiff Zulim observed many private vehicles being used to deliver duffle bags, assumingly filled with ballot envelopes, at the street curb adjacent to the Superior

Court building's east side.  Several of these vehicles were found to not be sufficiently marked/identified in accordance with the California Elections Code and ROV procedures, which required a distinguishing VBM number and a placard issued by the ROV.  The drivers of these vehicles, who were often observed not wearing the required vests, were observed to be unloading black duffle bags at a tent area near the curb at the east side of the Superior Court building.  Six vehicles were observed to be missing the required ROV certification placard and VBM ballot box identification number placard.  Some of these six vehicles had drivers wearing blue and fluorescent yellow vests labeled "Rover," with some sort of identifying badge held within a lanyard.  Some of these drivers were observed to NOT be wearing the required vests or badges.  Twelve individuals in total were observed to be delivering black canvas bags to the curb without the full identification required.

72.  Several times Plaintiff Zulim approached the ROV workers and their supervisor/lead who were working the VBM ballot receiving station, but each time were told to stay back and away from the vehicles and "Rovers."  Sufficient access to verify the labeling of each bag, chain of custody sheets, and "Rover" identification was not provided to Plaintiffs or other observers as required by California Elections Code §15104.  Plaintiff Zulim was unable to sufficiently ascertain any bag's chain of custody sheets against the seal's unique identification numbers.  The hand-off of each bag by the "Rovers" to the ROV workers could not be sufficiently ascertained in order to verify the process was entirely correct and not compromised.

73.  Plaintiff Zulim witnessed Ms. Hayden speaking with one delivery person who had come from the drop box at the San Leandro Courthouse building, and admitted that they had had to break a seal on one bag in order to fit more ballot envelopes.  The "Rover" delivery driver said that she had been given more seals and was able to re-seal the bag.  Plaintiff Zulim and Ms. Hayden discussed that this may be problematic, since drivers possessing additional seals allows for the potential of reopening and resealing of ballot duffle bags and thereby illegally adding additional ballots.  Compromised seals on any bags could allow additional ballots to be added without a proper chain-of-custody being completed.  This

COMPLAINT
PAGE 31 OF 69

was particularly suspicious since there was a concerted effort by the ROV workers to keep Plaintiff Zulim and Ms. Hayden far away from the ballot delivery and receipt process. Plaintiff Zulim and Ms. Hayden were denied the "sufficiently close access" required by California Elections Code §15104 and therefore could not "verify" the chain of custody documents, any check-in procedures, and/or controls that were in place.

74. Plaintiff Zulim noted that since bags were not readily identifiable from the exterior, then an untold number of unmarked black duffle bags could easily be dropped off, by anyone, therefore compromising any "chain of custody" process.

75. On the evening of November 8, 2022, at roughly 8:30pm, observers were allowed in small groups of three into a cordoned off area, roughly four-feet-by eight feet, of the Ballot Scanning room, more than fifteen feet away from the nearest of sixteen (16) scanning machines. As stacks of ballots of unknown type or quality or any other characteristic were being fed into the machines, some of the ballots would kick out onto a rear tray, but observers were not close enough even to see individual ballots, or the ballots that were fed into the tabulator, to be able to tell anything about them, such as whether they appeared to have been completed by hand or by machines. Observers asked questions of their ROV escorts, but as per usual were given the standards instruction to direct their questions in writing to Defendant CORNEJO.

76. On November 9, 2022, Mr. Bezis submitted a letter to the ROV again requesting "sufficiently close access" to verify the accuracy of the postmark analysis of "late" or "plus" VBM ballots (those arriving by U.S. mail, FedEx, DHL, or UPS, in the seven days after Election Day). Mr. Bezis cited the extremely low rate of late/plus ballot rejections in Alameda County compared to other California counties; in the June 2022 election there were only 23 rejections for "ballot not received on time," while more than 2,000 such ballot rejections each occurred in neighboring counties Contra Costa, Santa Clara, San Francisco, and San Mateo. Moreover, when Alameda City Councilmember Trish Spencer and Mr. Bezis attempted to view processing of late/plus mail on June 13, 2022, they were not permitted to view

COMPLAINT
PAGE 32 OF 69

the postmark analysis procedure, not permitted to view the accepted and rejected ballots afterwards, and not given any statistics Mr. Bezis had requested about acceptances or rejections of late/plus mail.

77.  On November 9, 2022, Plaintiffs M.Pechenuk and G.Pechenuk while attempting to observe at the ROV asked Defendant FRANCISCO when they were going to start the processing of all the late/plus VBM ballots currently arriving at the ROV to check the postmarks.  Defendant FRANCISCO directed them to send an email to Defendant CORNEJO, which they did send but never received a response.

78.  On November 12, 2022, a Saturday, Plaintiff Rocha visited the ROV along with her husband. Each was assigned a deputy, who escorted them all the way from the metal detector at the main entrance of the Superior Court building and downstairs to the ROV.  Plaintiff Rocha remarked that a deputy per observer seemed a bit heavy-handed; but no response was given by either deputy.

79.  Plaintiff Rocha was able to inquire of Defendant CORNEJO the following questions:  Are ROV staff date-stamping or in any way marking the envelope?  "No."  At what point in the process are unopened ballot envelopes checked to make sure they are not late (postmarked by USPS after 11:59pm on November 8, 2022) and in a bag with a proper chain of custody seal?  "At 9:30 each morning, in room 16, and continues until all envelopes are checked for the day.  Then the envelopes are counted to get the day's total, which is keyed into the running total of all ballots received.  Then staff starts opening the envelopes, in that same room."  What is the process for dealing with late ballots?  "These get set aside and placed [she thinks] in a black bag or some specific color of bag."  Defendant CORNEJO stated that she had no idea how many late/plus ballots had been received so far.

80.  Plaintiff Cobb also visited the ROV on Saturday, November 12, 2022, and was escorted to the Ballot Opening room 16.  He noted six workers checking postmarks, right at one of the "bank teller" windows so it was possible to observe the actual postmarks.  Plaintiff Cobb noticed that some workers were rejecting very few, while others were rejecting quite a few, envelopes, and in general they went through the stack very quickly therefore Plaintiff Cobb was unable to see if the envelope showed a

COMPLAINT
PAGE 33 OF 69

handwritten date (written by the voter) next to their signature. Plaintiff Cobb did not observe any workers date-stamping any ballots. Plaintiff Cobb next observed the scanning of envelopes in the ASR room. Four teams were scanning envelopes, which Defendant CORNEJO stated were from both U.S. mail and drop boxes. Plaintiff Cobb asked how much more was yet to be done. Defendant CORNEJO stated that as of two days ago she had been advised there were still 182,000 ballots to go. [Throughout the voting period, Defendant WEBER failed to post on the Secretary of State website timely daily updates of the counties' processed and unprocessed ballot counts, with several days' delays making it impossible for the public to track. It was precisely for reasons of expediency, accuracy and cost savings that voters had voted for electronic processing. The National Voter Registration Act states in 42 USC 15381 §241(a)(2) that it "will yield the most accurate, secure, and expeditious system for voting and tabulating election results."]

81. On November 12, 2022, Mr. Bezis sent a second request to the ROV for the written procedures for processing late/plus ballots, and "sufficiently close access" including being close enough to "verify" whether the late/plus ballot envelopes had no postmark, a postmark with no date, or illegible postmarks. According to the California Elections Code [*(d) Notwithstanding paragraph (2) of subdivision (b) of Section 2194, vote by mail voter observers shall be allowed sufficiently close access to enable them to <u>observe the vote by mail ballot return envelopes and the signatures thereon and challenge</u> whether those individuals handling vote by mail ballots are following established procedures, ...]* in order for VBM ballots that do not bear a postmark to be admitted, the ROV needs to apply a date stamp upon receipt of the ballot, and Plaintiffs must be allowed to observe whether this requirement has been fulfilled. The verification of this process was prohibited to observers.

82. On November 13, 2022, Plaintiffs M.Pechenuk and G.Pechenuk observed the 9:30am opening of the late/plus VBM ballots. Of the roughly fifty (50) ballots, only three were postmarked November 8, 2022; all others were postmarked November 12, with very few having no postmark. Those marked November 12, 2022 or with no postmark were placed in a red tray for rejection. On the "no

postmark" ballots Plaintiff M.Pechenuk did not observe the workers checking for handwritten dates next to the voters' signatures.

83. Plaintiffs M.Pechenuk and G.Pechenuk observed ballot opening in the same room, but again were not allowed "sufficiently close access" in order to verify the sorting distinctions, methods, or procedures. Then they were escorted to Adjudication / Remaking, where they were denied "sufficiently close access" but observed two workers at each terminal, checking ballots in red trays that had been "remade." (In the remaking of a ballot, one election worker reads the voter's paper ballot choices to the other election worker, who inputs the choice online. They are required to check each other's work for accuracy, both that the correct selection had been called and that the correct selection had been entered online.) For a while, only one team was remaking ballots, but at a certain point all the workers were instructed to perform remaking activities. Plaintiff M.Pechenuk asked the ROV escort, Defendant FRANCISCO, why some workers were filling in ballots with ink, but was told to direct questions in writing to Defendant CORNEJO. Later, Defendant FRANCISCO returned and advised that according to Defendant CORNEJO, those workers were remaking remote access vote by mail (RAVBM) and military ballots in preparation for scanning.

84. Plaintiff M.Pechenuk asked Defendant FRANCISCO where the provisional and damaged ballots were stored. She stated that they were stored in the Adjudication room. Plaintiff M.Pechenuk expressed incredulity that 11,000 to 12,000 ballots currently were stored in that room. [Note: The Help America Vote Act (HAVA) of 2002 requires that the voter be contacted and allowed to "cure" their own ballot. Under Title III *Uniform and Nondiscriminatory Election Technology and Administration Requirements*, Subtitle A *Requirements 42 USC 15481* §301 *Voting Systems Standards (a)(1)(A)(iii) if the voter selects votes for more than one candidate for a single office: (I) notify the voter that the voter has selected more than one candidate for a single office on the ballot; (II) notify the voter before the ballot is cast and counted of the effect of casting multiple votes for the office; and (III) provide the voter with the opportunity to correct the ballot before the ballot is cast and counted.* The ROV has no written procedure

COMPLAINT
PAGE 35 OF 69

for contacting voters to correct their ballot (i.e., for "curing" ballots).  All ballots rejected for any reason are immediately sent to "Adjudication," where a third party determines the voter's intent, and the ballot thus voted, in direct violation of Title III requirements cited above.]

85.  Much more critically, to establish the validity of any/all elections, verification of the eligibility of voters is essential.  To establish voter eligibility, U.S. citizenship must be proven.  There are only two ways to prove U.S. citizenship:  (1) through a birth certificate, or (2) through U.S.A. naturalization documents.  The National Voter Registration Act [HR 2 1993 103rd Congress, § 3(b)] requires that citizenship be attested on Motor Voter registrations.  It is the duty of the Secretary of State to verify the truth of the claim of U.S. citizenship.  To our knowledge, neither the Secretary of State nor the ROV have established processes or procedures to verify new voter registrants to prove their claim to be U.S. citizens.  There are now 26 ways for voter registration to be facilitated in California, including those completed by mail and through the Department of Motor Vehicles (DMV).  All methods of registering to vote in the State of California include a question about one's U.S. citizenship.  Without established procedures and processes to "verify" voter eligibility, there is a significant likelihood of ineligible voter participation.  It is a violation for the Secretary of State and/or the ROV to not verify the authenticity of new voter registrants' citizenship status.

86.  According to the National Voter Registration Act [HR 2 1993 103rd Congress, §8(a)(5)] the State shall *inform applicant under section 5, 6, and 7 of (A) voter registration requirements, (B) penalties provided by law for submission of a false voter registration application; (6)(b) CONFIRMATION OF VOTER REGISTRATION— Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office—(1) shall be uniform, nondiscriminatory and in compliance with the Voting rights Act of 1965 (42 USC 1973 et seq); (2) HR2 1993 103Sec 9 FEDERAL COORDINATION AND REGULATIONS (B) CONTENTS OF MAIL VOTER REGISTRATION FORM—(2)shall include a statement that—(A) specifies each eligibility requirement (including citizenship ); (B) contains an attestation that the applicant meets*

1    *each such requirement; and (C) requires the signature of the applicant, under penalty of perjury; (3) Sec*

2    *10 DESIGNATION OF CHIEF STATE ELECTION OFFICIAL … to be responsible for coordination of*

3    *State responsibilities under this Act.*

4    87.  Furthermore, according to Title 52 § 20981 *Election Administration Improvement (a) In*

5    *general – On such periodic basis as the Commission may determine, the Commission shall conduct and*

6    *make available to the public studies regarding the election administration issues described in subsection*

7    *with the goal of promoting methods of voting and administering elections which – (3) will be*

8    *nondiscriminatory and afford each registered and eligible voter an equal opportunity to vote and to have*

9    *that vote counted."*

10

11   88.  On November 14, 2022, Plaintiff Rocha and Mr. Bezis observed the sorting of late/plus

12   ballots in room 16, noting that ballots without postmarks and at least one ballot with a November 8, 2022

13   postmark were placed in the "red tray" with the late postmarks.  Therefore, it would seem that the "red

14   tray" is not a 100% rejects tray, and some further review procedure is then undertaken by ROV staff with

15   respect to those ballots.  The ROV escort informed Plaintiff Rocha and Mr. Bezis that the "further

16   review" of ALL late/plus mail for ALL days going back to Wednesday, November 9, 2022, had not yet

17   taken place.  This was doubtful.  Furthermore, staff were unable to state how many "red tray" ballots had

18   been collected to date.

19

20   89.  On November 14, 2022, Plaintiff Rocha sent an email to Defendants DUPUIS and

21   CORNEJO, noting that escort staff had advised her that the ballots ending up in "red trays" were all being

22   stored/stockpiled in one location unknown to escort staff, that was "off limits" to observers, and that they

23   would not be dealt with until some future date, en masse (all "red tray" ballots would be addressed at one

24   time).  Moreover, observers had not been given access to the processing of RAVBM ballots, or

25   information as to their storage/scanning status.  Plaintiff Rocha advised that observers had not been given

26   access to the processing of ballots delivered via FedEx, DHL, UPS, or other expedited service; that

27   Plaintiffs' interviews with drivers of those delivery services had disclosed that they were aware of large

28

COMPLAINT
PAGE 37 OF 69

bundles having been delivered as of November 14, 2022.  Plaintiff Rocha requested notification 24 hours in advance of the date/time and location of ROV processing of the "red tray" ballots so that observers could be present to witness those activities.

90. Later in the day November 14, 2022, while Mr. Bezis was observing in the Signature Verification room, the ROV escort advised Mr. Bezis that he was violating the Election Observer rules by taking notes; Mr. Bezis reminded the ROV escort of the clearly stated rights of observers as prescribed in the California Elections Code.  Following this observation session, Mr. Bezis, while in the ROV lobby discussing with Plaintiff Rocha his observations earlier, noticed a FedEx delivery being made at the ROV reception window.  After the delivery had been accomplished and the driver was exiting the ROV, Mr. Bezis approached him and inquired about the quantity of deliveries to the ROV.  From the ROV reception area, Defendant FRANCISCO called out to Mr. Bezis down the hall, that he was not allowed to speak with any delivery personnel.  Plaintiff Rocha observed a visibly agitated Defendant FRANCISCO begin to walk towards Mr. Bezis, who reminded Defendant FRANCISCO that he was in a public corridor for a lawful purpose therefore certainly was allowed to speak with delivery personnel.  Defendant FRANCISCO called for the ACSO deputies to remove Mr. Bezis from the ROV and the Superior Court building.  Three ACSO deputies removed Mr. Bezis from the building under threat of criminal arrest.

91. On November 15, 2022, Plaintiff M.Pechenuk and Mr. Jason Bezis were at the ROV observing the opening of late/plus ballots, Mr. Bezis pressed Defendant CORNEJO about the processing of late/plus FedEx, DHL, and UPS ballots being performed entirely outside of public view. Defendant CORNEJO accused Mr. Bezis of harassing the FedEx delivery driver the day before (who had shared with Mr. Bezis that he was delivering lots of late/plus ballots) and insisted that the public cannot view the authentication and opening of FedEx, DHL, or UPS packages containing ballots.  Mr. Bezis explained that potentially there could be hundreds of ballots arriving in those packages after Election Day, snuck into the ballot stream entirely outside of public view.

COMPLAINT
PAGE 38 OF 69

92. Mr. Bezis further explained to Defendant CORNEJO that earlier that day, he and Plaintiff M.Pechenuk had observed workers placing a handful of ballots without postmarks in the "blue tray," with peculiar "NOV 8 2022" ink stamp markings on them that had no indication they were legitimate postmarks. These ballots should have gone into the "red tray" for further analysis. When Mr. Bezis questioned Defendant CORNEJO about this observation, she stopped answering questions and proceeded to summon law enforcement. An ACSO sergeant with Badge No. 1356 asked Defendant CORNEJO if Mr. Bezis was "disturbing" them, as he was acquiring "probable cause" for Mr. Bezis' arrest. The sergeant then addressed Mr. Bezis, first accusing him of "trespassing," to which Mr. Bezis responded that this would be a ridiculous charge since he was in the public corridor of a courthouse, present for a lawful purpose. Then the sergeant resorted to "Penal Code 415" violation, suggesting that Mr. Bezis' questioning of Defendant CORNEJO, whom the sergeant referred to as a low-level front-desk receptionist that Mr. Bezis was "harassing" and "badgering," was "loud" and therefore disrupting Defendant DUPUIS' employees from doing their work. Two additional ACSO deputies joined the sergeant. Plaintiff M.Pechenuk witnessed that Mr. Bezis was forced to exit the premises. Once outside, the sergeant cautioned Mr. Bezis that he could not return to the courthouse building that day, and that if he ever returned to the ROV that staff could effect a "citizen's arrest" at the first infraction, until law enforcement arrives. Mr. Bezis found the sergeant to be extremely ignorant about the concept of election observers, arguing that the public had no right to see any voting processing activities because they were "behind closed doors" such that even he as a deputy could not enter the ballot processing rooms. Mr. Bezis quickly elucidated some of the pertinent California Elections Code sections (2300, 15004, 15104, and 15204) and the Voters' Bill of Rights to the sergeant, however the sergeant did not appreciate the information. One of the deputies declared that Defendant DUPUIS and his staff were overburdened by the written inquiries of election observers, and with a copy of the Election Observer Rights and Responsibilities in her hand continued to argue that "sufficiently close access" was at the discretion of Defendant DUPUIS.

COMPLAINT
PAGE 39 OF 69

93. On November 16, 2022, Plaintiff Rocha sent a second request (a re-send of her November 14, 2022 email) to Defendants DUPUIS and CORNEJO regarding the processing of "red tray" ballots, RAVBM ballots, and ballots delivered via FedEx, DHL, and UPS. Plaintiff Rocha was concerned, for example, that the RAVBM ballots were supposed to have been placed in the "red trays" for further processing/analysis/adjudication; however, since observers were denied "sufficiently close access" for purpose of verifying that the ballots were being sorted appropriately in all the 20+ ballot opening stations of Ballot Opening room 16 and how many of the "red trays" contained any RAVBM ballots. Furthermore, observers were unable to verify whether the remade ballots reflected the actual choices made in the voters' original ballots. This is evident from the Adjudication/Remake procedures that made clear that all RAVBM ballots had to be remade, yet observers were denied "sufficiently close access," therefore were unable to verify that all remake stations in the Adjudication/Remake room were accurately remaking RAVBM ballots.

94. On November 17, 2022, Plaintiffs observing remotely via the video feed into the Ballot Scanning room noted that the camera angle was not capturing all sixteen (16) scanning machines. At least one of the sixteen machines was hidden behind a pillar near the windows, and therefore could not be seen from the roped-off area where in-person observers were confined.

95. Mr. Bezis, attorney for ACTA, informed the Plaintiffs on November 17, 2022 that the ROV was claiming to the Secretary of State that it had 128,000 unprocessed ballots as of 4:11pm the day before, which might or might not have been an accurate number, given that the ROV has in the past defied the Secretary of State's instructions. [Reference the ROV's November 10, 2020 report to the Secretary of State that hid the existence of 8,000 ballots that would ultimately change the outcome of the Measure W election that year; and the first time that the Secretary of State and the public learned of the existence of those "hidden" ballots was when they were "discovered" on November 12, 2020 (after the ROV was closed for Veterans Day November 11) and turned around the outcome of Measure W from "no" to "yes."]

96. Early in the morning of November 18, 2022, Mr. Bezis sent an email to Defendants DUPUIS and CORNEJO that, given the One Percent Manual Tally that was currently under way, he was requesting the "list of all the batches of VBM ballots and Vote Center ballots by precinct…numbered with consecutive numbers from one to the exact number of batches and precincts used in the election" as prescribed in the California Elections Code. Mr. Bezis requested the aforementioned list in electronic format as soon as possible.

97. November 18, 2022 at 2:09pm was Ms. Hayden's next visit to the ROV, to observe in room 16 with the "bank teller" windows. Ms. Hayden was the only in-person observer, escorted by Mr. Majeet Singh, Defendant NORMENT, and an ACSO deputy, while *remotely* Mr. Bezis and some of the Plaintiffs attempted to observe the random selection of batches in preparation for the upcoming One Percent Manual Tally, which was to begin on November 21, 2022. Ms. Hayden was in phone/text contact with colleagues who were watching the video feed online.

98. When staff began to draw random coupons that were meant to relate to batch numbers representing precincts, Ms. Hayden received a text from Plaintiff Guerrero stating that in the video feed it was not possible to tell what the numbers were that were being handwritten by ROV staff on the whiteboard as the batches were being randomly selected, since the handwritten numbers were being marked in pale red. When staff finished with the first round of 34 numbers, Ms. Hayden took a photo of her notes that listed the numbers, with the intent of texting the photo to her colleagues.

99. The One Percent Manual Tally may be considered to be an audit of a random sampling of ballots, for purposes of verifying the election results. It may be deemed to be akin to a limited "recount" of the vote. California Code of Regulations Title 2, § 20821 Media, Photography, and Recording Devices, states: *The elections official shall…develop a written policy providing reasonable access to the recount location by the media, and the use of cameras or audio or video recording devices in the recount location in a manner that will not interfere with the recount, compromise the anonymity of any ballot or*

COMPLAINT
PAGE 41 OF 69

*record the signature of any voter. Interested parties and observers shall be permitted the same access for use of cameras or audio or video recording devices as members of the media.*

100. Ms. Hayden later informed Plaintiffs that when she took a photo of her handwritten notes, Defendant NORMENT shouted to her that she was disturbing the process, that the observation was to end immediately, and that Plaintiff Hayden must leave the premises. By this point in the One Percent Manual Tally, it was after 3:30pm. Plaintiff Hayden had already been observing for over 90 minutes.

101. Mr. Bezis, and other remote observers who had been viewing the One Percent Manual Tally remotely, informed the Plaintiffs that the video feed for remote observation went dead at 3:45pm.

102. The following day, November 19, 2022 (Saturday), Dr. Joseph Grcar picked up Ms. Hayden outside of Santa Rita Jail, where she had been detained over night.

103. On November 19, 2022, Mr. Bezis informed the Plaintiffs that he had located the list of batches of VBM ballots and Vote Center ballots that he had requested of the ROV on November 18, 2022, only after which the ROV actually uploaded the list to its acvote.gov website. Mr. Bezis deduced from the list the reason why there were three separate pools of "raffle" tickets pulled during the selection on November 18, 2022: VBM batches; Election Day (Vote Center) batches; and San Leandro Unified School District batch. It remained unclear, however, what the "universe" of VBM ballots included in the 1% sample. In other words, what was the cutoff point – were ballots scanned up to November 16th? Up to November 17th? Up to the hour before the so-called "random selection"? Furthermore, the One Percent Manual Tally was supposed to include at least some ballots from EVERY race in Alameda County; how and when would additional batches be selected, if necessary? These are some of the questions for which observers were not given any answer.

104. On November 21, 2022 at 7:20am, Plaintiff Cota on behalf of election observers including all Plaintiffs sent an email to Defendant DUPUIS, Defendant CORNEJO, and Dwayna Gullatt requesting a copy of the Summary Report referenced in item 7 of the Manual Tally Procedures issued by the ROV, for all of the batches in the list of 1% of batch selected on Friday November 18, 2022 so that in-person

observers and remote observers could gauge the results starting November 21, 2022 at 9:30am when ROV workers would begin their activities.  Plaintiff Cota further requested the precinct list for the Vote Center 1% Tally, as none of the batches selected had precinct numbers on them.  Plaintiff Cota explained, for example, that she was unable to determine if the Livermore Mayor race would be properly verified if the public did not know what tally batch that precinct was in.  Plaintiff Cota further asked when additional batches would be selected in compliance with California Elections Code § 15360:  *In addition to the 1% manual tally by mail ballots, the elections official shall, for each race not included in the initial 1% tally of vote by mail ballots, count one additional batch of vote by mail ballots.  The manual tally shall apply only to the race not previously counted.*  Plaintiff Cota then reiterated the request previously made by Plaintiff Rocha and Mr. Bezis that the ROV provide the date for further review of late/plus ballots that were set aside in "red trays" between November 9 and November 15, 2022.

105.  On November 21, 2022, Plaintiffs M.Pechenuk, Rocha, and Zulim, and another election observer, attended the One Percent Manual Tally (1%MT) in room 16.  ROV staff escorted the observers, which included a member of the Sheng Thao campaign for Oakland mayor.  By the time the observers arrived in room 16 at 9:45am following check-in, the process was already under way, calling the results for the Governor's race.

106.  Plaintiffs noted that the observer advocating for Sheng Thao was allowed to pull out her phone and look at it many times, with no objection from the two ROV escorts.  Later, when Ms. Hayden was in the same room observing and took out her phone, immediately one of the escorts, Defendant NORMENT, sternly said, "Put that phone away, I am warning you."

107.  Plaintiffs were unable to see or hear anything on the other side of the "bank teller" windows, although indistinctly could hear the tables closest to Plaintiffs, roughly fifteen feet away, call out some of the names in Plaintiff M.Pechenuk's assembly race.  Plaintiff M.Pechenuk was able to distinguish callouts at tables 2 and 3; with table 3 calling the winner of an entire pile all for Mia Bonta, and a few undervotes from another pile.  This seemed to be consistent with other tallies and for those of

COMPLAINT
PAGE 43 OF 69

the ballot propositions, which had a lot of undervotes.  Although Plaintiffs had requested in writing, the day before, that the ROV furnish the Summary Report sheets by which they could effect comparison with what would be transpiring in the One Percent Manual Tally room, the Summary Report sheets were never provided to Plaintiffs.  Moreover, throughout their observations, when Plaintiffs requested their ROV escorts to provide the Summary Report sheets, the ROV escorts advised that no documents were available to Plaintiffs.

108.  Plaintiff Zulim while observing the 1%MT attempted to utilize a monocular telescope with magnification, but was only able to observe the two closest tables/stations "2" and "3" and was unable to hear what the election workers called out as the votes for each ballot, nor ascertain whether the workers were following procedures prescribed in the California Elections Code or the ROV's own established procedures.  When Plaintiff Zulim asked to enter room 16 beyond the "bank teller" window area, he was denied entry.  Utilizing the monocular, Plaintiff Zulim was able to note that Batch 125 was being worked on at table "2" while Batch 174 was being worked on at table "3."  Given that the ROV had not shared the Summary Report sheets with any of the Plaintiffs, Plaintiff Zulim was unable to check the validity of the 1%MT.  Furthermore, it was obvious that at least three tables/stations in the far corner of the room were obscured from view of the observers, while the view of several tables/stations were blocked by large structural columns in the room.  Review of the video feed disclosed that the same areas blocked from in-person viewing were not real-time video versions of the process.

109.  Plaintiff Rocha discovered, lying on the counter along the "bank teller" windows, copies of the schematic for the table configurations in room 16.  The schematic showed twenty-one (21) tables, three (3) of which were entirely hidden in the rear, rightmost corner of the room, over fifty feet from where Plaintiffs were permitted to observe.

110.  Plaintiff Rocha remained at the ROV the entire day, from 9:30am until workers in room 16 quit work for the day at roughly 5pm, and stayed an additional ninety minutes, roughly, in the ROV lobby along with Plaintiff Zulim in hopes of receiving the Summary Report that they had requested, but to no

avail; ROV staff did not furnish the Summary Report.  As Plaintiffs Rocha and Zulim were standing at

the monitor hanging on the wall at the corner of the ROV lobby, watching the current status of the various

races as they flashed on the monitor, Plaintiff Rocha happened to turn around, and observed a woman

emerging from the inner office of the ROV, holding a cell phone.  As the woman was passing Plaintiffs

Rocha and Zulim on her way to the elevators, Plaintiff Rocha remarked to Plaintiff Zulim that the vote

count for the San Leandro mayoral race, which was of interest to Plaintiff Rocha as a resident of San

Leandro, was exactly the same as it was on the date of Plaintiff Rocha's last visit to the ROV back on

November 14.  The woman turned around and approached Plaintiffs Rocha and Zulim, greeting them in a

friendly fashion.  She and the Plaintiffs exchanged pleasantries, the Plaintiffs identified themselves as

observers interested in the integrity of the elections, and the woman identified herself as a member of the

Alameda County Democrat Central Committee.  Having overheard Plaintiff Rocha's remark about the

San Leandro mayoral race, the woman commented that the results on the monitor have not been updated

for that particular race, but that she could show Plaintiff Rocha the most updated results on the DNC

website.  The woman proceeded to scroll up and down the screen of her cell phone, stopping on a section

showing the San Leandro mayoral race, which showed the candidate who would ultimately win the San

Leandro mayoral race, several hundred votes ahead of the candidate that was currently shown, on the

ROV monitor, as being in the lead.  Plaintiff Rocha expressed relief that her preferred candidate was

"actually" in the lead, notwithstanding what the ROV was showing on its monitor, and continued with

Plaintiff Zulim their discussion with the woman about the election in general.  After the woman departed,

Plaintiffs Rocha and Zulim noted that it was interesting how a member of a Democrat organization would

have privileged information that the ROV had not yet shared with the general public.  In light of the

familiarity the woman appeared to have with the ROV staff and the premises, it was doubtful that the

source of the information she had on her phone would have been revealed to Plaintiffs Rocha and Zulim,

had they asked, or that the information would have been expositive, truthful, accurate, helpful, or

otherwise forthcoming.

COMPLAINT
PAGE 45 OF 69

111. On November 22, 2022, Plaintiff Cota sent her second request via email to the ROV for the Summary Report. Plaintiff M.Pechenuk in person at the ROV also asked for the Summary Report, to no avail. Plaintiffs M.Pechenuk, Cota, Cobb, Guerrero, G.Pechenuk, Rocha, and Zulim delivered public comments in the Board of Supervisors meeting attesting to the continuing civil and California Elections Code violations at the ROV, including the arrest of Ms. Alison Hayden. Plaintiffs reiterated their concerns expressed in the November 1, 2022 Board of Supervisors meeting that the ROV seemed disposed to "weaponize" the ACSO against observers, and had become emboldened by the apparent unconcern of the Board.

112. On November 23, 2022 at 5:04pm, after nearly half of the 1%MT had been completed, including the provisional/conditional ballots, ROV staff member Ms. Dwayna Gullatt furnished the Summary Report to Plaintiff Cota. Moreover, to Plaintiff Cota's previous request for the date and method by which additional batches would be selected, Ms. Gullatt's response that "The Registrar of Voters reviewed the contests within the remaining batches to ensure that we can include all of the contests needed for the 1% manual tally," was incorrect, since the 38 batches selected did NOT include Albany, Dublin, Newark, Emeryville, or Sunol. This means that the ROV would need to select MORE batches for selective hand counts to cover those missing races. The ROV was not telling Plaintiffs the whole story.

113. On November 28, 2022, at 11:20am, Mr. Bezis submitted a letter to Defendant DUPUIS noting again the ROV's unlawful interference with ACTA's rights to observe/challenge the tallying/auditing of ballots, and repeatedly threatening Mr. Bezis with criminal arrest; the ROV's unlawful conduct of the manual tally that began on November 21, 2022, due to inconsistency with California Elections Code § 15104, 15204, and 15360 and the ROV's established procedures disallowing the "public process" prescribed by law, and continued denial of "sufficiently close access" by observers to election activities; and that the 38 batches selected on November 18, 2022 are missing batches for several races such as the Sunol Glen school district; and several additional matters of concern that Mr. Bezis had already previously brought to Defendant DUPUIS' attention. Under the Voters Rights Act, §11 covers all

COMPLAINT
PAGE 46 OF 69

aspects of the voter process to include prohibiting intimidation of observers, with states imposing penalties for violations.

114. On November 28, 2022 at 11:54am, another five (5) batches were added to the whiteboard in room 16 – presumably, for the Albany, Dublin, Newark, Emeryville, and Sunol races. As a result of these additional batches, election observers were entitled to receive the additional Summary Report sheets corresponding to those five races; however, written requests to the ROV staff for those Summary Report sheets were not fulfilled.

115. On December 1, 2022, Plaintiff Rocha was notified by Ms. Dwayna Gullatt of the ROV that returned late VBM ballots were scheduled to be processed at 10am on Friday December 2. Based on this notification from the ROV, Mr. Bezis submitted a letter to Defendant DUPUIS requesting any and all established procedures for processing late/plus VBM ballots, and when, how, and to whom observers may "challenge whether those individuals handling VBM ballots" were following established procedure, as per California Elections Code § 15104. Furthermore, Mr. Bezis advised that he was unable to locate the VBM ballots scheduled to be processed on December 2, 2022 in the current "unprocessed ballots" report issued by the Secretary of State; the Alameda County row showed that zero ("0") ballots remained to be processed. Mr. Bezis requested a list of total late/plus ballots in each category arrived (1) by U.S. mail, and (2) by "bona fide private mail delivery company" on November 9 through 18, 2022; how many had been placed in "blue trays" (accepted), and how many had been placed in "red trays" (for further review). Mr. Bezis' letter to the ROV reiterated several additional concerns. Mr. Bezis received no response to this letter.

116. On December 2, 2022 Mr. Bezis informed Plaintiffs that the observable activities at the ROV had begun promptly at 10:00am, and were completed by 10:08am, having taken only eight (8) minutes; i.e. apparently it took the ROV a mere eight minutes to "process" **ALL** of the "red tray" ballots that had accumulated from November 9 through November 15, 2022.

COMPLAINT
PAGE 47 OF **69**

117.  On December 8, 2022, Defendant DUPUIS executed a statement of certification, which was then presented to the County Board of Supervisors on December 20, 2022 for ratification.  On the morning of December 20, 2022, Mr. Bezis submitted a letter to the Board enumerating several reasons why they should not accept Defendant DUPUIS' attempt to certify the election, citing, among other concerns, that Defendant DUPUIS' statement of certification did not include the results of the One Percent Manual Tally, nor did it identify "any discrepancies between the machine count and the manual tally and a description of how each of these discrepancies was resolved," which was in violation of California Elections Code § 15360(f):  *The official conducting the election shall include a report on the results of the 1 percent manual tally in the certification of the official canvass of the vote.  This report shall identify any discrepancies between the machine count and the manual tally and a description of how each of these discrepancies was resolved.*

118.  During the December 20, 2022 Board of Supervisors Meeting, the Board proceeded to ratify the election certification, despite the objections enumerated in Mr. Bezis' letter, and despite public comments given by Plaintiffs M.Pechenuk, Cota, Cobb, Guerrero, G.Pechenuk, Rocha, and Zulim, and other members of the public describing the egregious deficiencies in Defendant DUPUIS' processing of ballots throughout the period from start of Early Voting (October 10, 2022) through the One Percent Manual Tally (completed November 28, 2022), and cautioning the Supervisors that Defendant DUPUIS' statement of certification had failed to include the required results of the manual tally and description of how discrepancies have been resolved, had failed to properly represent all election races in the manual tally, and had failed to include all nine rounds of the Oakland mayoral race.  Moreover, Plaintiffs reiterated the lack of "sufficiently close access" to adjudication and remake workstations to verify the quality of ROV operators' work products.

119.  On December 28, 2022, Defendant DUPUIS issued a press release stating, *The ROV learned that its Ranked Choice Voting tally system was not configured properly…It should have been configured to advance ballots to the next ranking immediately when no candidate was selected for a*

COMPLAINT
PAGE **48** OF **69**

*particular round.  This means that if no candidate was selected in the first round on the ballot, then the second-round ranking would count as the first-round ranking, the third-round ranking would count as the second-round ranking, and so on.  For the November 2022 General Election, the setting on the County's equipment counted the RCV ballots in the manner in which the ballot was completed, meaning no vote was registered for those ballots in the first round of counting because those voters did not identify a valid candidate in a particular rank on the ballot.  Once it became aware of the issue* [after analysis, by FairVote.org, of the RCV races] *the ROV immediately investigated it.  The ROV worked with its vendor* [Dominion Voting Systems, "Dominion"] *to figure out the source of the issue and to resolve it.  After reviewing the election data and applying the correct configuration, the ROV learned that only one outcome was affected:  Oakland School Director, District 4...No other result for any RCV election in any jurisdiction was changed...The ROV is currently working with its vendor to provide safeguards so that this does not happen in future elections.*

120.  In the January 10, 2023 regular meeting of the Board of Supervisors, which was attended by Defendants MILEY, CARSON, HAUBERT, MURANISHI, and ZIEGLER, Plaintiffs gave public comments regarding the errors discovered in the RCV races; reiterating Defendant DUPUIS' having failed to include, in his 1800-page Statement of Vote document that was included in the December 20, 2022 Board packet, all nine rounds of RCV tallying in the Oakland mayoral race (i.e. the report only showed round 1); stating their support of the National Association for the Advancement of Colored People (NAACP) call for a public, 100 percent ballot-by-ballot manual tally of the Oakland mayoral race; demanding that the Board compel Defendant DUPUIS to convene a public hearing to examine/question Dominion under oath as per the spirit and intent of 2021 California Elections Code § 15303 Division 15 *Semifinal Official Canvass, Official Canvass, Recount, and Tie Vote Procedures*, for the purposes of determining if any other potential defects in the election results existed, and reiterating the numerous concerns that Plaintiffs had brought to Defendants' attention in prior meetings of the Board.

121. On January 12, 2023, Mr. Bezis submitted a letter to the Alameda County Board of Supervisors, including Defendants MILEY, CARSON, and HAUBERT, elucidating the requirements of California Elections Code § 15303 (*If the returns from any precinct are incomplete, ambiguous, not properly authenticated, or otherwise defective, the elections official may issue and serve subpoenas requiring members of the precinct board to appear and be examined*), and California Elections Code §15304 (*In jurisdictions using a central counting place, the elections official may appoint not less than three deputies to open the envelopes or containers with the materials returned from the precincts. If, after examination, any of the material are incomplete, ambiguous, not properly authenticated, or otherwise defective, the precinct officers may be summoned before the elections official and examined under oath to describe polling place procedures and to correct the errors or omissions.*) Mr. Bezis clarified the term "precinct board" as including personnel at the central counting place, especially in Voter's Choice Act counties such as Alameda. "'Precinct board,' when used in relation to proceedings taking place after the polls have closed, likewise includes any substitute canvassing and counting board that may have been appointed to take the place of the board theretofore serving." [California Elections Code §339(b)] Given that Defendant DUPUIS had admitted in the December 28, 2022 press release and in his January 5 and 10, 2023 verbal testimony to the Board that he and his consultants and other agents did not compile the RCV results in accordance with proper procedures before certifying the election on or about December 8, 2022, it follows that "the returns" were "incomplete, ambiguous, not properly authenticated, or otherwise defective, therefore the Board should have directed Defendant DUPUIS to fulfill the requirements of the California Elections Code by calling for consultants (Dominion) and election workers to appear in a public hearing and be examined under oath concerning vote-counting and results.

122. The Board of Supervisors, under the legal guidance of Defendant ZIEGLER, failed in its fiduciary and constitutional duty to the public to require Defendant DUPUIS to undertake such an investigation in a public hearing, choosing instead to rely on his *summary* of the sidebar discussion he

had had with Dominion over the phone, via email, or in person (only Defendant DUPUIS and Dominion know which) but not in a public setting, under oath. Throughout the month of January, additional facts came to the Board's attention regarding the errors to which Defendant DUPUIS had admitted with respect to the Oakland Unified School District 4 ("OUSD4") race, as well as concerns expressed by the Oakland chapter of the NAACP with respect to the Oakland mayoral race, both of which were RCV races; resulting in the Board calling a special meeting on January 31, 2023 in an effort to delve further into these two main issues.

123.   On February 1, 2023, a court-ordered review of the "suspended ballots" involved in the OUSD4 race was undertaken at the ROV, which was scheduled to continue through February 8, 2023. Observers in attendance during the review period were, on various days, Plaintiffs M.Pechenuk, G.Pechenuk, Cota, and Guerrero, as well as other observers. [Note:  Following the in-person ballot review, Plaintiff Guerrero analyzed the ROV's selection of ballots to be reviewed.  Examination of the Cast Vote Records, supplied by the ROV, showed that the OUSD4 ballots were spread across 393 batches.  Of those 393 batches, 154 contained ballots in which the voter had left the First Rank Choice blank.  It is evident, therefore, that the ROV had pulled ballots only from the group of 154 and not from the entire 393.]

124.   On February 2, 2023, Ms. Hayden sent via email (copied to Plaintiffs) a written report to Judge Seligman, who was overseeing the OUSD4 suspended ballot review, outlining the experience that the observers had had on day 1 of the review -- namely, that batch boxes were already in the room, had been unsealed without public viewing; that because Defendant DUPUIS knew the Cast Vote Record identified precisely where all 154 of the 393 batches were, and that their isolation had already been accomplished, the purpose of the staged event on February 1 was unclear.  When asked why the public had not been notified in order to observe the initial extraction, Defendant CORNEJO stated that she had been out on leave and did not know why the public had not been informed).  California Elections Code §15004 "Sufficiently close access" to observe and verify the process was not provided.  Numerous other

COMPLAINT
PAGE 51 OF 69

deficiencies occurred on February 1, 2023, which caused Plaintiffs to request that the Judge make clear to Defendant DUPUIS that the California Elections Code must be followed in the second phase of the suspended ballot review, commencing the following Monday February 6, 2023, specifically allowing observers to be present to watch the batches of ballots if they have since been moved from their February 1, 2023 location, to another room; that observers be given sufficiently close access to verify task accuracy; that an observer is stationed at each table where the review is conducted; and that the ballots be resealed in the batch boxes at the end of the review.

125.   On February 6, 2023, Plaintiff Cota sent an email to Defendants DUPUIS and CORNEJO, and copied the Board of Supervisors, advising of discrepancies between the findings in the live ballot review and data in the Cast Vote Record ("CVR"). Among several discrepancies, the most concerning was the Tabulator '1002, Batch 25, Record 464 ballot, which showed a different ranking result than did the CVR.

126.   On February 6, 2023, Plaintiff Guerrero emailed a letter to the Board of Supervisors advising them of civil rights violations, under the 14th Amendment, caused by a limit of five rank choices on the ballot allotted to voters even though there were ten candidates to choose from and that 1,954 voters had properly voted their five rank choices but were not allowed to vote in the subsequent rounds. A second letter to the Board advised of a similar confusing situation for voters with respect to the San Leandro races. Plaintiff Guerrero suggested that the Board address these instances of voter disenfranchisement.

127.   On February 7, 2023 Plaintiff Cota provided another report to all interested parties, of that day's suspended ballot review, enumerating several discrepancies and concerns. The concerns would appear to indicate that the ROV seems to purposefully arrange for things to NOT be clear, to NOT be transparent, and to NOT ensure that unlawful ballots are kept out of the ballot stream.

128.   On February 9, 2023 Plaintiff Guerrero noted in an email to Plaintiffs, to local representatives of the NAACP, and other interested parties concerned about the two Oakland races, that

COMPLAINT
PAGE 52 OF 69

the ROV had concluded their so-called "review" of the 235 suspended ballots in the OUSD4 race.  Of the suspended ballots, 22 were actually "overvotes" (more than one candidate selected in a ranked choice column), and one paper ballot showed a "Manigo" vote whereas the CVR showed the vote as having been assigned to "Hutchinson"; hence a total of 23 errors.  The total of 23 tabulation errors out of 235 results in an error rate of nearly ten percent (10%), which should have prompted a hand count of the entire OUSD4 race.  Ultimately, however, since candidate "Resnick" withdrew from the contested race, leaving Hutchinson to be certified as the winner, the need for a hand count appeared to be moot therefore no further action was taken by the ROV, or the Board, to correct the ROV's deficiencies and errors or to investigate the other races further in light of the ROV's deficiencies.

129.  On February 14, 2023, the ROV presented its results of the Ranked Choice Voting Suspended Ballot Review of the OUSD4 race.  Plaintiff Guerrero noted that the results make no mention of Tabulator 1002, Batch 25, Record 464 paper ballot data being missing on the CVR.

130.  On February 22, 2023, Ms. Hayden sent via email (copied to Plaintiffs) a letter to Judge Seligman summarizing the findings of the suspended ballot review for the OUSD4 race, outlining the continued deficiencies at the ROV, the tabulator errors, the two suspended ballots that came from Tabulator '1002 Batches 25 and 72, Records 464 and 352, respectively, listed in the CVRs that did not match the rankings on the actual paper ballot, and pointing out most importantly that the deficiencies emerging from the suspended ballot review should have been detected during the One Percent Manual Tally (1%MT) but for some reason not yet explained by the ROV, they were not detected.  Furthermore, the recorded ballots in the Cast Vote Record for two of the votes did not correspond with any of the actual paper ballots in the batch of ballots pulled for the 1%MT.  The letter provided ample justification for further action by Defendant COUNTY OF ALAMEDA as a starting point towards restoring voter confidence in all County elections.

131.  In Board of Supervisors meetings subsequent to the December 20, 2022 meeting during which the Board ratified Defendant DUPUIS' statement of certification of the November 2022 Election,

COMPLAINT
PAGE 53 OF 69

Plaintiffs in good faith rendered public comments enumerating the multiple and egregious violations by

Defendants DUPUIS and CORNEJO under color of authority, under the supervision of Defendant

MURANISHI, who also was present at Board of Supervisors meetings therefore was well aware of the

conduct of both Defendant DUPUIS and Defendant CORNEJO.  Plaintiffs very clearly demonstrated to

elected and appointed officials in the Board meetings that Plaintiffs as unpaid volunteers having

performed their observations at the ROV over several months with a combined total exceeding 100 hours

were in effect attempting to compel highly-compensated Defendants to simply do their jobs, as prescribed

in the California Elections Code, in service to the voting community.

132.  In numerous Board of Supervisor meetings in which the Board had invited Defendant

DUPUIS to present election findings, explain anomalies identified by Plaintiffs and other interested

parties, including concerns regarding the Ranked Choice Voting races, Plaintiffs made numerous logical,

well-founded, and expositive public comments including the fact that Defendant DUPUIS is and has for

several years served as both *Director of Information Technology* and *Registrar of Voters*, hence "part-

time" in each capacity, to the obvious detriment of his responsibilities to the voting community with

respect to the latter.

133.  During one of the Board of Supervisors meetings, Defendant DUPUIS obfuscated certain

facts.  When Plaintiffs in their numerous public comments pointed out three mistakes the ROV had made

regarding three suspended ballots included in the One Percent Manual Tally that were part of the OUSD4

race, Defendant DUPUIS stated a falsehood by omission when he claimed that the One Percent Manual

Tally had verified those three OUSD4 suspended ballots against the CVR, in that he failed to mention that

the CVRs tallied those three as "suspended" erroneously, and should have tallied them as two "overvotes"

and one "Hutchinson" vote.  The manual tally should have detected the CVR's tally of three "suspended"

as incorrect.  The manual tally had been incorrectly performed, however Defendant DUPUIS in his

testimony to the Board of Supervisors left out this fact.  The reason the "three suspended ballots" v. CVR

issue is important is because if these errors are extrapolated outward for the entire election, there is the distinct possibility that most if not all races in the November 2022 election had similar errors.

134. Additionally, Defendant DUPUIS did not discuss the two "errored" ballots also found among the 235 OUSD4 suspended ballots. Defendant DUPUIS did acknowledge that he had not granted Plaintiff Guerrero's request for the images (digital photos) of the two "errored" ballots, claiming that the Secretary of State has a directive not to disclose those images; a disingenuous claim, given that San Francisco County does share ballot images on its website, and only in rare cases where there are notable stray marks on a ballot or uniquely distinct ways in which a voter filled in the ovals, could a voter possibly be identified by a ballot. Ballots with such markings could be isolated and kept from public view.

135. Mr. Bezis in several public comments to the Board of Supervisors throughout the months of January, February, and March 2023 called the Board's attention to the fact that the One Percent Manual Talley, which concluded on November 30, 2022, and was supposed to have served as the "watchdog" immediately following Election Day, had failed in its objective in that it did not detect the discrepancies between it and the Cast Vote Record; i.e. the "watchdog" had failed to "bark." Furthermore, Defendant DUPUIS covered up the discrepancies with the RCV suspended ballots, in that in Defendant COUNTY OF ALAMEDA'S official report to the Secretary of State (https://elections.cdn.sos.ca.gov/manual-tally/2022-general/alameda.pdf), in the form's field stating, "Description of any discrepancies noted (include details about each discrepancy and how each was resolved; also include anything unusual observed during the manual tally process or anything that may improve the manual tally process)," Defendant DUPUIS had responded "No discrepancies found."

136. In his response to inquiries by the public and the Board of Supervisors as to why the 1%MT had failed to detect any discrepancies, Defendant DUPUIS explained that "The purpose of the 1% manual tally is to verify that the machine tabulation is correct. The reports used to verify the tabulation in the 1% Manual Tally are based off of the settings chosen at the time the election is configured. The manual tally

COMPLAINT
PAGE 55 OF 69

did not find any discrepancies in the tabulation because of the way the election was configured."

However, California Elections Code §15360, which requires the ROV to conduct the 1%MT, states in

paragraph (f), "In resolving a discrepancy involving a vote recorded by means of a punch card voting

system or by electronic or electromechanical vote tabulating devices, the voter verified paper audit trail

shall govern if there is a discrepancy between it and the electronic record." As such, Defendant DUPUIS

has it all wrong: The paper ballot ("the voter verified paper audit trail") controls. Defendant DUPUIS

was supposed to hand count the Oakland RCV ballots selected in the "one percent sample" independently

of the machine count. The 1%MT teams should have counted each "suspended" ballot correctly. Each

"manual tally" team should have reported a "discrepancy" with each and every "suspended" ballot.

Defendant DUPUIS is wrong in regarding the "machine count" as sacrosanct.

137. On March 1, 2023, Plaintiff Zulim submitted an Election Complaint Form, or HAVA

Complaint, via CERTIFIED MAIL to Defendant WEBER in the Secretary of State's office, outlining the

ROV's exceeding the maximum error rate, as prescribed in HAVA Title III Subtitle A § 301(a)(5), which

states the following: *Error Rates – The error rate of the voting system in counting ballots (determined by*

*taking into account only those errors which are attributable to the voting system and not attributable to*

*an act of the voter) shall comply with the error rate standards established under § 3.2.1 of the voting*

*systems standards issued by the Federal Election Commission (FEC) which are in effect on the date of the*

*enactment of this Act.* In the HAVA filing, Plaintiff Zulim attested to having personally witnessed, during

the court-ordered "Suspended Ballot Review" of 235 ballots from the OUSD4 race, one error that was not

caught or disclosed by the ROV, and that another error of similar nature had been observed by another

observer, for the very same review. Plaintiff Zulim's HAVA complaint was properly notarized.

138. On March 10, 2023, Plaintiff Cota submitted a HAVA complaint, via CERTIFIED MAIL to

Defendant WEBER in the Secretary of State's office, attesting to having personally witnessed on

February 6, 2023, during the court-ordered "Suspended Ballot Review" of 235 ballots from the OUSD4

Election, Hutchinson v. Resnick lawsuit. Of the 235 ballots, Plaintiff Cota identified two (2) ballots that

exhibited errors where the Cast Vote Record did not match the paper ballot. Each paper ballot had far fewer than 100 ballot positions. The two errored ballots were referenced in the CVR as follows: Tabulator ID No. 1002 Batch ID No. 25 Record ID No. 464 (1002-25-464), two (2) errors; and Tabulator ID No. 1002 Batch ID No. 72 Record No. 352 (1002-72-352), one (1) error. Two (2) out of 235 ballots represents an error rate of 0.85%. The Hutchinson v. Resnick lawsuit involved a vote margin of 41 out of 25,000 or 0.164%. Since the percentage of the errored ballots found during the "Suspended Ballot Review" was over five (5) times that of what was in question in the lawsuit, it followed that a further audit of the ballots, with a much larger sample size to determine the actual error rate of the November 2022 election, was justified. Plaintiff Cota's HAVA complaint was properly notarized.

139. With respect to both cases – notarized HAVA complaint submitted by Plaintiff Zulim, and notarized HAVA complaint submitted by Plaintiff Cota – Defendant WEBER to date has not issued a response or acknowledgment to either affiant, nor has Defendant WEBER directed Defendant DUPUIS to address the stated errors.

140. Plaintiffs Zulim and Cota, by virtue of having submitted notarized HAVA complaints to Defendant WEBER yet receiving no follow-up communication from Defendant WEBER or any of her staff in the office of the Secretary of State, conclude that making available the remedy of preparing, having notarized, and mailing a HAVA complaint, with accompanying detailed affidavits, is reduced to a mere bureaucratic contrivance by the State to appear to take election integrity seriously. Given that Defendant WEBER by her inaction with respect to the HAVA complaints, as well as allowing to stand Defendant DUPUIS' patently erroneous official report to the Secretary of State summarizing the results of the November 2022 election, has demonstrated her refusal to exercise her authority under Government Code §12172.5 to enforce California election law in Alameda County, Defendant WEBER did embolden Defendant DUPUIS to continue his systematic, intentional violation of Plaintiffs' civil rights, and is therefore complicit with the ROV and all Defendants in denying Plaintiffs their civil rights under the U.S. Constitution and the State Constitution.

141.  The primary complaint of Plaintiffs is the ROV's forbidding of real-time challenges and resolutions to errors made in processes.  Procedures and processes are established to ensure the accuracy of the given task.  Prior to the Voters Choice Act being implemented in Alameda County, items challenged were immediately pulled from the process and immediately resolved by a third party. Currently, however, challenges allowed under California Elections Code §15104, but observers have been met with threats and intimidation from Defendants CORNEJO, NORMENT, FRANCISCO, and other ROV escorts whenever Plaintiffs would state a challenge.  There are no procedures for real-time resolutions.

142.  Furthermore, Plaintiffs have made numerous public comments informing Defendant COUNTY OF ALAMEDA, the Board of Supervisors, Defendant MURANISHI as County Administrator, Defendant ZIEGLER as County Counsel, and Defendant DUPUIS, that Defendant DUPUIS and his staff have continuously insisted that every "challenge" to ballot collection, storage, and processing be made in writing, without pulling out the envelope or ballot in question, making a resolution impossible.  In the case of envelopes, ROV staff could extract the ballot from the "challenged" VBM envelope, causing the challenge to become effectively moot because there is no way to "challenge" a VBM ballot as 100% invalid after it has been separated from its envelope.  In the case of defective ballots, there is no process or procedure in place to contact the voter to cure it because it is no longer attached to its identifying envelope (ballots themselves possess no identifying information); they are sent directly for Adjudication. Additionally, Plaintiffs informed Defendants of the myriad ways in which the ROV's constructed system is deliberately arranged to keep observers from being able to make challenges.  For example, forcing challenges to be made in writing, and preventing challenged ballots from being pulled out for immediate resolution made it impossible to identify a specific envelope that had an ambiguous or missing postmark. In the postmark review of "plus" VBM ballots (those arriving by U.S. mail, FedEx, DHL, or UPS, in the seven days after Election Day), true verifications were not possible.  Emboldened by the inaction by the Board of Supervisors, County Counsel, and the County Administrator, the ROV's second-round review of

COMPLAINT
PAGE 58 OF 69

VBM ballots without postmarks took place 100% in secret, without observers, as did the processing of FedEx, UPS, and DHL ballots that arrived after Election Day.  Defendant DUPUIS and his staff knew the drill:  Hide activities from observers so that no one can raise a "challenge."

143.  Plaintiffs are informed and believe, and intend to prove after conducting relevant discovery, that Defendants' actions were motivated largely or entirely by the following:  (1) Plaintiffs' conservative ideology, with a strong and abiding respect for the rule of law, even in the face of Defendants' continuous and flagrant disregard of the rule of law; (2) Plaintiffs' numerous visits to the ROV for purposes of observing election processes, which Defendants had never before experienced; (3) Plaintiffs' numerous inquiries, verbal and written, which Defendants had never before experienced, regarding ambiguous, hidden, and defective ballot processing activities that Plaintiffs were observing, since Plaintiffs were furnished only "some" (nowhere near covering all) of the many ballot processing procedures implemented by ROV permanent and temporary staff; (4) Defendants' (both ROV and ACSO) own ineptitude, inexperience, and ignorance of Election law; and (5) Defendants' (both ROV and ACSO) inadequate development and training of staff.

144.  On June 30, 2023, in a good faith effort to resolve these matters amicably, Plaintiffs submitted a letter, with supporting documentation, via email and registered U.S. Postal Service mail, to Defendant COUNTY OF ALAMEDA's Clerk of the Board of Supervisors, along with the County's required Claim form ("Claim"), in accordance with instructions posted on Defendant's official website, and pursuant to California Government Code §910 et seq.  The Claim package was submitted as notification of Plaintiffs' allegations of civil rights violations by Defendant COUNTY OF ALAMEDA, seeking response to the allegations of Plaintiffs within thirty (30) days or Plaintiffs would proceed with further action through this Court.  However, Defendant COUNTY OF ALAMEDA, via its designated representative George Hills Company, returned Plaintiffs' Claim without having investigated any of Plaintiffs' allegations.

COMPLAINT
PAGE **59** OF **69**

145.  On June 30, 2023, Plaintiffs sent a letter, with supporting documentation, via email and registered U.S. Postal Service mail, to Defendant WEBER, along with the State's required Claim form, in accordance with instructions posted on the State of California's official website, and pursuant to California Government Code §910 et seq.  The Claim package was submitted as notification of Plaintiffs' allegations of civil rights violations by Defendant WEBER, seeking response to Plaintiffs' allegations within thirty (30) days or Plaintiffs would proceed with further action through this Court.  However, Plaintiffs have not received response from Defendant WEBER, or the Secretary of State's designated representative(s) to accept and address claims submitted to the State, either acknowledging their Claim, denying their Claim, or otherwise informing them of the results of any investigation into their Claim.

146.  Moreover, Plaintiffs presented their claims to Defendants MILEY, CARSON, HAUBERT, MURANISHI, and ZIEGLER in regular meetings of the Board of Supervisors, to no avail.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 – *Monell* and Supervisor Liability

(Against Defendants COUNTY OF ALAMEDA, ZIEGLER, AHERN, SANCHEZ, DUPUIS, CORNEJO, NORMENT, FRANCISCO, and DOES 1-50)

147.  Plaintiffs refer to paragraphs 1-146 of this Complaint and incorporate by reference the allegations of said paragraphs as though expressly set forth at length at this point.

148.  The unconstitutional actions and/or omissions of Defendants COUNTY OF ALAMEDA, ZIEGLER, AHERN, and DOES 1-50 were pursuant to the following customs, policies, practices, and/or procedures of Defendant COUNTY OF ALAMEDA, and which were directed, encouraged, allowed and/or ratified by policymaking officials with the County of Alameda the ACSO:

a.  To threaten to carry out, to carry out, or tolerate unlawful detentions without reasonable suspicion;

b.  To threaten to carry out, to carry out, or tolerate unlawful arrests without probable cause;

COMPLAINT
PAGE 60 OF 69

c. To threaten to carry out, to carry out, or tolerate detentions and arrests based on citizens' refusal to cooperate with consensual encounters;

d. To threaten to carry out, to carry out, or tolerate detentions and arrests based on citizens' exercise of their First Amendment right to criticize and verbally protest deputies' actions;

e. To carry out or tolerate discriminatory and biased policing and/or racial, political, or other profiling;

f. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning each of the foregoing practices;

g. To ignore and/or fail to properly investigate, supervise, discipline, and/or terminate deputies who have engaged in unlawful or unconstitutional law enforcement activity;

149. Defendant COUNTY OF ALAMEDA and DOES 1-50 failed to properly screen, hire, train, instruct, supervise, evaluate, investigate, discipline and/or terminate staff who exhibited wrongful acts, omissions, and behaviors, with deliberate indifference to Plaintiffs' constitutional rights.

150. The unconstitutional actions of Defendants DUPUIS, CORNEJO, NORMENT, and FRANCISCO, and DOES 1-50 were approved, tolerated, and/or ratified by policymaking officers for Defendant COUNTY OF ALAMEDA and the ACSO.

151. The aforementioned customs, policies, practices, and procedures, and the failure to properly screen, hire, train, instruct, monitor, supervise, evaluate, investigate, discipline and terminate; and the unconstitutional approval, ratification and/or toleration of the wrongful conduct of Defendants DUPUIS, CORNEJO, NORMENT, and FRANCISCO, and DOES 1-50 were a moving force and/or proximate cause of the deprivation of Plaintiffs' clearly established constitutional rights.

152. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered injuries and damages as set forth above.

COMPLAINT
PAGE 61 OF 69

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SECOND CAUSE OF ACTION

### Negligence

#### (Against all Defendants)

153.  Plaintiffs refer to paragraphs 1-152 of this Complaint and incorporate by reference the allegations of said paragraphs as though expressly set forth at length at this point.

154.  The individual Defendants owed Plaintiffs a duty to use reasonable care in connection with the parties' interactions as described herein.  In particular, said Defendants had a duty to carefully investigate any criminal or unlawful activity, to use care to avoid subjecting Plaintiffs to threat of an illegal detention, threat of arrest, threat of the use of force, intimidation, deprivation of rights under the U.S. Constitution and the California Constitution, including the California Elections Code, and to use reasonable care to avoid engaging in biased policing, racial profiling, political profiling, or conspiratorial conduct among the Defendants to deprive Plaintiffs of any of their rights enumerated herein.

155.  In doing the things herein alleged, Defendants breached the applicable duty of care by acting unreasonably, carelessly, negligently, and/or recklessly, and by acting capriciously, or with an intent to intimidate, discourage, or intentionally inconvenience Plaintiffs during their efforts to exercise their rights.

156.  As a direct and proximate result of Defendants' conduct, Plaintiffs suffered injuries and damages as set forth above.

157.  Defendant COUNTY OF ALAMEDA is vicariously liable for the acts and omissions of its employees acting in the course and scope of said employment, pursuant to California Government Code §815.2.

158.  The conduct of the individual Defendants was malicious and oppressive in that they intended to harm Plaintiffs and deprive them of their rights or their actions were despicable and carried out with a willful and conscious disregard for Plaintiffs' rights and safety, entitling Plaintiffs to punitive

COMPLAINT
PAGE 62 OF 69

damages pursuant to California Civil Code § 3294.  No punitive damages are being sought against Defendant COUNTY OF ALAMEDA.

### THIRD CAUSE OF ACTION

#### 42 U.S.C. § 1985 – Conspiracy to Interfere with Civil Rights

(Against all Defendants)

159.  Plaintiffs refer to paragraphs 1-158 of this Complaint and incorporate by reference the allegations of said paragraphs as though expressly set forth at length at this point.

160.  42 U.S.C. § 1985 Paragraph 3 *Depriving Persons of Rights or Privileges*, states:  *If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators. ...*  In addition, Paragraph 2 states:  *If two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection*

*of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of*
*any person, or class of persons, to the equal protection of the laws.*  Defendants conspired with one
another to deprive Plaintiffs of equal privileges under the laws of the United States and the State of
California.  Under Amendment 1 of the Bill of Rights, the people have the right to assemble peacefully,
and to petition the government for a redress of grievances.

161.  The right "to petition the government" is not a one-sided undertaking; the government
owes the people some measure of response to the people's petition.  Defendants in this suit owed
Plaintiffs a duty to hear their grievances, at the very least acknowledge having received their grievances,
and to the extent that it was possible to address the grievances, Defendants should have done so, in a
manner that honors the spirit of federal and state laws.  Defendants DUPUIS, CORNEJO, NORMENT,
and FRANCISCO failed to fulfill this duty by requiring written questions from Plaintiffs that Defendants
then ignored.  Defendants MILEY, CARSON, HAUBERT, MURANISHI, LARA, and WEBER, failed to
fulfill this duty by initially offering, requiring, inviting, or affording Plaintiffs the opportunities and
methods for redress but then ignoring Plaintiffs' well-documented complaints and petitions.  Furthermore,
this failure was discussed among the Defendants in internal meetings and other methods of
communicating protocol with respect to the ROV's interaction with election observers, including the
potential engagement of law enforcement; therefore, Defendants did conspire with one another against
Plaintiffs.

162.  Defendants ZIEGLER, MILEY, CARSON, HAUBERT, MURANISHI, DUPUIS,
CORNEJO, and WEBER, failed to take corrective measures upon Plaintiffs having informed them during
the Board meeting public comments period, of the October 5, 2022 New York Times article reporting the
arrest of the Chief Executive Officer of ROV vendor Konnech Inc., whose data for poll workers had been
discovered on servers in China, constituting a security breach at the minimum, and possibly foreign
interference in our federal elections.  Notwithstanding these obvious dangers, the ROV continues in its
contractual relationship with Konnech Inc.

COMPLAINT
PAGE 64 OF 69

163. Moreover, Defendants ZIEGLER, MILEY, CARSON, HAUBERT, MURANISHI, DUPUIS, CORNEJO, and WEBER failed to take corrective measures upon the designation of federal elections in 2017 as "critical infrastructure" by the Department of Homeland Security, carrying with it requirements that all aspects of the voting system be sourced, designed, manufactured, integrated, assembled and tested in the U.S. under the Department of Defense (DOD) standards.   Alameda County's voting machines are by mostly Dell Computers, with the most critical components designed and manufactured in China.  The ROV knowingly continued to approve contracts with Dominion Voting Systems, the latest dated December 15, 2018 to expire December 31, 2029, and having ongoing updates and maintenance of voting machines and software not under DOD standards constitutes conspiracy against the United States of America (18 USC 371).

164. The right "to assemble peacefully" without fear of injury, oppression, threat, or intimidation was denied to Plaintiffs, given that Defendants DUPUIS, CORNEJO, NORMENT, and FRANCISCO, in conspiracy with Defendant COUNTY OF ALAMEDA the ACSO, persistently held the weaponization of law enforcement over the heads of Plaintiffs as a form of oppression, threat, and intimidation, even citing in the ROV handout Election Observation Rights and Responsibilities, Penal Code §415 regarding disruptive behavior.  Penal Code §415 appeared to be the all-encompassing Code section that law enforcement could and would use in concert with the ROV, since Defendants were unable to cite any other laws or regulations that would prohibit or inhibit the observers' activities.  For example, apparently Defendants defined "disruptive" as to include asking questions of the ROV.

165. Plaintiffs appeared to have been singled out from other public visitors to the ROV, including political candidates and their staffs, political organizations and groups, and the media, who seemed to have unlimited access to ROV resources including staff, election results, reports, and other significant sources of information. Defendants DUPUIS, CORNEJO, NORMENT, and FRANCISCO held Plaintiffs to a higher standard of requesting access to resources as a form of political discrimination.

COMPLAINT
PAGE 65 OF 69

166.  In Board of Supervisors meetings, Defendants MILEY, CARSON, HAUBERT, MURANISHI, and ZIEGLER manipulated meeting agendas such that *discussion* of the election preparations, processing, and results was often removed from the Board meeting agendas, and public comments were either allowed a fraction of the time of other agenda items, or disallowed entirely.  These actions by Defendants involved some level of planning and decision-making, suggesting that Defendants conspired with one another to minimize Plaintiff involvement with respect to discussion of a problematic election aftermath.  Furthermore, Defendants failed in their duty, at least, to compel or counsel Defendants DUPUIS, CORNEJO, NORMENT, and FRANCISCO to correct their behavior.

167.  Defendant WEBER as Secretary of State failed to investigate properly, if at all, the HAVA complaints filed by Plaintiffs Zulim and Cota, and in this manner conspired with Defendant DUPUIS to conceal his errors and quash any possibility of correcting the election results.  More importantly, however, Defendant WEBER by her inaction failed, in her duty as Secretary of State in charge of elections, to safeguard the rights of Plaintiffs as observers, and by this inaction did condone the conspiratorial behavior of the other Defendants against Plaintiffs.

168.  In doing the things herein alleged, Defendants breached the applicable duty of care by acting unreasonably, carelessly, negligently, and/or recklessly, and by acting capriciously, or with an intent to intimidate, discourage, or intentionally inconvenience Plaintiffs during their efforts to exercise their rights under the First Amendment to the U.S. Constitution to assemble peacefully and to petition the government for a redress of grievances.

169.  Defendants owed Plaintiffs a duty to allow them to peacefully observe and challenge election processes, with "sufficiently close access" to all election processes undertaken by the ROV so as to reasonably verify that Defendants were in compliance with the California Elections Code.  In particular, said Defendants had a duty not merely to prevent Plaintiffs from being deprived of their rights, but to ensure that Plaintiffs would have reasonable unrestricted access to all election activities so as to exercise their rights.

COMPLAINT
PAGE 66 OF 69

170.  In doing the things herein alleged, Defendants breached the applicable duty of care by acting unreasonably, carelessly, negligently, and/or recklessly, and by acting capriciously, or with an intent to intimidate, discourage, or intentionally inconvenience Plaintiffs during their efforts to exercise their rights.  Plaintiff M.Pechenuk and Ms. Hayden were attempting to monitor the status of their races – Plaintiff M.Pechenuk as a candidate for Member of the State Assembly, and Ms. Hayden as a candidate for Member of the House of Representatives – however by the acts and omissions of Defendants were deprived of, or were intimidated, harassed, and/or treated dismissively and disrespectfully by Defendants in order to compel Plaintiff M.Pechenuk and Ms. Hayden to circumvent the reasonable exercise of their rights.  These actions by Defendants demonstrating a pattern of abuse, harassment, and contempt made light of the candidacy of Plaintiff M.Pechenuk and that of Ms. Hayden, jeopardized the success of their races or at minimum decreased their vote totals, and so adversely impacted their candidacy that their prospects of future candidacy may be significantly jeopardized.

171.  In addition to Plaintiff M.Pechenuk, Plaintiffs Cota, Cobb, Guerrero, G.Pechenuk, Rocha, and Zulim were deprived of their rights to observe and challenge the election processes overseen by Defendants DUPUIS and CORNEJO, with legal representation and document gate-keeping by Defendant LARA, to receive answers to their inquiries, to receive copies of all written documentation utilized by the ROV as described in the California Elections Code, to be given "sufficiently close access" to all election processes and activities in order to verify the accuracy of the ROV's work products – such as all reports submitted to the Secretary of State, the statement of certification, etc. – without being subjected to the ROV's weaponization of law enforcement, the ACSO, for purposes of intimidating, threatening, or in any way discouraging Plaintiffs from exercising their rights.

172.  Defendants by their acts or omissions directly and indirectly prevented Plaintiffs from properly verifying the results of the November 2022 Election, from participating as observers/challengers with the same access to ballot processing as other visitors to the ROV, and as other members of the public including individuals from organizations more favorably aligned with the ROV's overall political biases,

and by these actions and behaviors Defendants did demonstrate conspiracy with one another against Plaintiffs.

173.  As a direct and proximate result of Defendants' conduct, Plaintiffs suffered injuries and damages as set forth above.

174.  Defendant COUNTY OF ALAMEDA is vicariously liable for the acts and omissions of its employees acting in the course and scope of said employment, pursuant to California Government Code § 815.2.

175.  The conduct of the individual Defendants was malicious and oppressive in that they intended to harm Plaintiffs and deprive them of their rights or their actions were despicable and carried out with a willful and conscious disregard for Plaintiffs' rights and safety, entitling Plaintiffs to punitive damages pursuant to California Civil Code § 3294.  No punitive damages are being sought against Defendant COUNTY OF ALAMEDA.

## PRAYER FOR RELIEF

Plaintiffs pray for damages as follows:

a.  A declaratory judgment declaring Defendants' lack of uniform and secure vote counting, laws, regulations, and procedures, and lack of uniform law enforcement laws, regulations, and procedures, a violation of the Equal Protection Clause and Due Process Clause to the Fourteenth Amendment;

b.  Injunctive relief preventing the Defendants from enforcing and/or applying a lack of uniform and secure vote counting laws, regulations, and procedures, and from enforcing and/or applying a lack of uniform law enforcement laws, regulations, and procedures;

c.  For compensatory damages in an amount according to proof;

d.  For punitive damages against Defendants DUPUIS, CORNEJO, NORMENT, FRANCISCO, and DOES 1-50 in an amount sufficient to punish their conduct and deter similar conduct in the future,

COMPLAINT
PAGE **68** OF **69**

pursuant to 42 U.S.C. § 1983, California Civil Code §52.1 and §51.7, and 42 U.S.C. § 1985.  No punitive damages are sought against Defendant COUNTY OF ALAMEDA;

  e. For an additional award of up to three times the amount of compensatory damages, pursuant to California Civil Code §52(a) and §52.1;

  f. For all applicable statutory penalties, including but not limited to those provided by California Civil Code §51.7, §52, and §52.1.

  g. For attorneys' fees pursuant to 42 U.S.C. § 1988, California Civil Code §52.1(i) and §52(b)(3), and California Code of Civil Procedure §1021.5, and any other applicable authority;

  h. For costs of suit; and

  i. For such other and further relief as the Court deems just and proper.

DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: August 9, 2023

Mindy Pechenuk, Lead Plaintiff
In Pro Per

/s/ Jacqueline Carron-Cota
Jacqueline Carron-Cota

/s/ Hunter Cobb
Hunter Cobb

/s/ John Leon Guerrero
John Leon Guerrero

/s/ Gerald Pechenuk
Gerald Pechenuk

/s/ Cindy Rocha
Cindy Rocha

/s/ Mark Zulim
Mark Zulim

COMPLAINT
PAGE **69** OF **69**